BANKLINE OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 56484, 72502. Promulgated January 16, 1936.

*A. L. Weil, Esq.*, for the petitioner.
*George D. Brabson, Esq.*, for the respondent.

912

MORRIS: The petitioner seeks total exemption of the income derived during the taxable year 1930 from "Lease #89", between itself and the State of California, under the doctrine of implied immunity, relying primarily upon *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393. The respondent, on the other hand, relies upon *Burnet* v. *Jergins Trust*, 288 U. S. 508.

*Burnet* v. *Coronado Oil & Gas Co.*, *supra*, arose out of a lease entered into between the State of Oklahoma and Coronado Oil & Gas Co. "By the Enabling Act Congress required' as a condition precedent to the admission of Oklahoma into the Union that her Constitution should make provision for common schools; and for their benefit it granted certain lands to the state with the proviso that

those valuable for minerals, gas, and oil should not be sold prior to January 1, 1915, but might be leased. Act of June 16, 1906, 34 Stat. 267, 270, 272, 273. The State Constitution (article 11, §1) established a common school system and pledged her faith to preserve the lands so conveyed by the United States as a sacred trust, and to keep the same for the uses and purposes for which they were granted. The Legislature prescribed regulations for leasing and directing payment of the proceeds into the school fund." *Burnet* v. *Coronado Oil & Gas Co.*, *supra*. Some of those lands were leased to Coronado Oil & Gas Co., by which the state was to, and did, receive a certain percentage of the gross production of oil and gas produced thereunder. The Court there held that the lease was an "instrumentality of the state for the purpose of carrying out her duty in respect of public schools."

In *Burnet* v. *Jergins Trust*, *supra*, the city of Long Beach, California, had acquired and held certain acreage for water supply purposes until, in 1922, oil was discovered in the vicinity thereof, when A. T. Jergins Trust was organized under the laws of California to obtain an oil and gas lease upon such lands. It was stipulated in such lease that the city should receive 40 percent and A. T. Jergins Trust, 60 percent of the proceeds of oil and gas recovered. The taxpayer in that proceeding relied upon *Gillespie* v. *State of Oklahoma*, 257 U. S. 501 and *Burnet* v. *Coronado Oil & Gas Co.*, *supra*. But the Court said, holding the income taxable, " In both of those cases the sovereign was acting as the trustee of an express trust with regard to the lands leased. In both the burden upon the public use was more definite and direct than in the present case. As said in the *Coronado* case, the doctrine of *Gillespie* v. *Oklahoma* is to be applied strictly and only in circumstances closely analogous to those which it disclosed."

We find nothing, in principle, to distinguish the instant case from *Burnet* v. *Jergins Trust*, *supra*. The proposed tax is upon the net income of an independent private corporate entity from any and all sources, not upon the property of the municipality, upon its share of the oil recovered, the lease itself, nor the gross income therefrom. This income is just as remote from any governmental function as it was there. Certainly there is no close analogy between the circumstances of this case and those found in *Burnet* v. *Coronado Oil & Gas Co.*, *supra*. Upon this issue we sustain the respondent's determination.

The petitioner alleges and contends that it is entitled to depletion under its casinghead gas contracts and in support of such contention it relies upon *Signal Gasoline Corporation* v. *Commissioner*, 66 Fed. (2d) 886, reversing the Board at 25 B. T. A. 861.

Sections 234 and 204 of the Revenue Act of 1926, applicable to allowable deductions and the basis for determining depletion, etc., are as follows:

SEC. 234. (a) In computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\* \* \* \* \* \* \*

(8) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee;

\* \* \* \* \* \* \*

SEC. 204. (c) The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in subdivision (a) or (b) for the purpose of determining the gain or loss upon the sale or other disposition of such property, except that—

\* \* \* \* \* \* \*

(2) In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph.

The applicable provisions of the Revenue Act of 1928 are substantially the same as those of the Revenue Act of 1926 quoted above.

In *Signal Gasoline Corporation, supra,* the petitioner acquired a number of already existing casinghead gas contracts for which it assumed certain obligations, aggregating in excess of $50,000, and it paid cash of $107,488.41, and 450,000 shares of its common capital stock, par value $1 a share. There, as here, the petitioner, under its contracts—in many respects similar in terms to the contracts of this petitioner, but differing in many other vital respects—acquired wet gas from producers in the State of California. The contracts here are similar in their aims and objects but they differ widely in their scope of performance. The aims and objects, in both instances, were to produce wet gas and by a process of manufacture to render that wet gas a salable, useful commodity. They were similar in that the petitioner, in each instance, was to acquire, by purchase, leases, or otherwise, all of the natural gas produced at a specified well for the purpose of extracting the gasoline therefrom and disposing of it, together with the dry gas—that is, such dry gas as was not consumed in the manufacture or blown to air, for the benefit of the parties concerned in proportion to their contractual interests. In both cases the petitioner was required to lay the necessary pipe lines from the well to the absorption plant and, of course, such rights of ingress and egress as were necessary to the upkeep of such pipe lines were

provided for. One noteworthy distinction, however, appears in the fact that in the instant case the producer, not the petitioner, was required to furnish necessary casingheads and gas traps to which the producer agreed to deliver the wet gas and from which the petitioner agreed to convey, through its pipe line, to its plant for treatment. In that case there appears to have been a much greater obligation on the part of the petitioner. Its duties respecting the production of gas did not cease with the delivery of wet gas to the casinghead or gas traps but it was required " whenever it became feasible and advisable, to install a vacuum upon the wells " and furthermore, " that it would install the necessary equipment and maintain such vacuum as was desired " by the producer " for regulating the pressure to be exerted in the operation." The petitioner there " assisted in drilling wells by furnishing separators, casing, derricks, boilers, other drilling equipment on the outcome of the well ", for which it " received no payment, if the well was dry." Not only were the producers there bending their efforts toward the production and delivery of gas to the petitioner, but " producers and the petitioner were both engaged in continuous steps to win oil and casing-head gas from their position in the earth." In that case "After a well had ceased flowing in commercial quantities from the natural pressure, it was necessary, in the case of most of the wells, for petitioner to take direct means by the introduction of high pressure dry gas into the well to induce a larger flow of oil and gas." In the instant case the petitioner was only required to return to the producer such quantity of gas as was necessary for injection purposes—it was required to take no " direct means " to bring about the production of gas— what means it took were indirect and merely incidental to its contractual obligation.

So much for the distinctions between the instant case and the case relied upon by the petitioner to support its claim. Let us examine a contract of this petitioner and see if we are able to find, as the court did there, that the interest of the petitioner was in the nature of a profit *a prendre*. Unless there was, of course, the petitioner would have no depletable interest. It is clear to our minds that it was intended by these contracts to establish an independent relationship between the parties, the producer, producing wet gas, on the one hand, and the manufacturer, converting that wet gas into salable commodities on the other. The preamble of this typical contract recites that the producer " is the owner of the natural gas produced " under that contract; that the petitioner has erected a plant for the extraction of gasoline; that in order to obtain " an adequate supply of gas for said plant " the petitioner " desires to receive from Producer all of the natural gas which may be produced " under such

contract; that the "Producer is desirous of having the gas produced" under that contract "treated for the extraction of gasoline therefrom", and "as an inducement to Bankline to operate a plant capable of treating the natural gas produced" the producer "is willing and desires to deliver to Bankline all of the natural gas produced."

The body of the contract repeatedly speaks in language of separate and independent obligations of the parties leaving not the slightest suggestion of an intention to create a right of profit *a prendre*. Speaking of this right, the court in *Signal Gasoline Corporation*, *supra*, said: " Considered by themselves, the contracts may not specifically convey any title to gas in the ground, but the contracts confer upon petitioner the right to enter upon the land and connect its pipes directly with the oil wells, install meters, and petitioner is required to maintain vacuums on the oil wells. These provisions, together with the method of operation sanctioned by the parties whereby petitioner, by means of gas lifts, rodless pumps, and the use of compressors to create vacuums, extracted the gas that would otherwise not be produced from the premises, conferred upon it an incorporeal right to be exercised in the land in relation to the gas which was in the nature of a grant of a profit *a prendre*." The only provision for the use of vacuum, found in only two of these contracts (there being seven), one of which, entered into between the petitioner and the General Petroleum Corporation on June 9, 1922, says:

The first party [General Petroleum Corporation] hereby agrees to deliver to the second party [petitioner] at the traps or casing-heads of the wells in said Signal Hill District during the life of this agreement as hereinafter set forth, all gas which is now or which may be hereafter produced by the first party from any or all wells located in said Signal Hill District, and the said second party shall have the right to apply such vacuum if any as the first party shall hereafter indicate, and the vacuum to be applied to such wells may be changed from time to time as conditions in such wells warrant, but such change can only be made upon the sanction and consent in writing of said first party.

This provision, however, falls far short of establishing an absolute duty upon the petitioner or an absolute right in it to apply a vacuum without the approval of General Petroleum Corporation. At any rate there is really no proof of record that this contract, which was to continue so long as General Petroleum Corporation had available gas in the Signal Hill District, was actually in force during the years in question. Nor does the other contract in which it is provided for, dated March 23, 1926, alter our conclusion.

The court there was convinced that the contracts under consideration and the " methods employed in reducing the wet gas to possession " created " an interest in the gas in place or a right to share in the gas produced." It concluded that the petitioner has the " requi-

site economic interest which under the statute entitled it to reasonable allowances for depletion." We are not so convinced.

There is not sufficient evidence for us to find here, as the court did there, that when the wells were drilled down to sand, only a small portion of the gas rose sufficiently to be caught in the casinghead, nor may we conclude from the evidence before us, as the court did, that "This would amount to such an insignificant quantity we would not have justified the erection of a plant to reduce it." There is some evidence of record from which we may conclude that difficulties were encountered from time to time in forcing the gas to the surface, but we can not conclude that this difficulty was of such magnitude as the court there was able to find. Nor may we conclude, assuming the petitioner to have been cognizant of such factors at the outset, that it would not have installed such an extensive plant had not its contract with the producer granted it an interest in the mineral in place or assured it of a portion of the gross proceeds therefrom. It is safe to say, we believe, that this petitioner had no enforceable rights whatsoever under its contracts prior to the time the wet gas was actually placed in its pipe line, i. e., after it had passed beyond the casingheads and gas traps supplied by the producer and into the pipe line, except the right, perhaps, to demand that the producer deliver whatever was produced through its pipe lines for treatment during the period of contractual relationship.

Upon the record, the petitioner has wholly failed to establish a depletable interest under the statute.

Even if all other facts, to which we have referred, pointed to a favorable conclusion for the petitioner, we are of the opinion that the proof upon the subject of rates falls short of the mark for reasons which we need not discuss. See *Lomita Gasoline Co.*, 33 B. T. A. 385.

Recomputation of the deficiencies, if any, should be in accordance herewith and the stipulation of the parties.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

SMITH and MURDOCK concur in the result.

TRAMMELL, VAN FOSSAN, and ARNOLD dissent.

BLACK, concurring in the result: I agree without reservation as to the first point. I concur in the result which has been reached in the majority opinion on the second point, but I do so on the ground stated in the concluding paragraph of the opinion to the effect that petitioner has failed to show that the value of wet gas at the mouth of the well purchased under casinghead gasoline

918

contracts was in excess of the royalties paid therefor and therefore has not shown any proper basis for depletion deductions. *Signal Gasoline Corporation*, 30 B. T. A. 568; affd., 77 Fed. (2d) 778; *Lomita Gasoline Co.*, 33 B. T. A. 385.

I do not concur in that part of the discussion in the majority opinion which holds that the casinghead gas contracts in the instant case are sufficiently different from those present in *Signal Gasoline Corporation* v. *Commissioner*, 66 Fed. (2d) 886, as to make the two cases distinguishable and to justify the holding in the majority opinion that petitioner in the instant case has no depletable interest arising out of the casinghead gas contracts. Petitioner's failure of proof to show what *amount* of depletion deductions, if any, it is entitled to take, appears to be similar to that in the cases above cited. As the court said in *Signal Gasoline Corporation* v. *Commissioner*, 77 Fed. (2d) 778, "Since the taxpayer is seeking a deduction for depletion from its otherwise taxable income, the burden of proof is upon it not only to prove that it is entitled to the deduction but also to prove the correct amount thereof."

ARUNDELL and LEECH concur in the above.