**FOOD MACHINERY AND CHEMICAL
CORPORATION, a Corporation**

v.

**The UNITED STATES.**

No. 357–59.

United States Court of Claims.

July 16, 1965.

Harry R. Horrow, San Francisco, Cal., for plaintiff, Robert W. Morrison, John G. Clancy, and Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel.

Theodore D. Peyser, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant, C. Moxley Featherston, Lyle M. Turner, and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE and DAVIS, Judges, and JONES, Senior Judge.

JONES, Senior Judge.

The plaintiff, Food Machinery and Chemical Corporation, sues for an alleged overpayment of Federal income taxes for the year 1949 caused by the defendant's disallowance of a deduction to plaintiff for depletion of mineral deposits in that year. The amount claimed by the plaintiff as percentage depletion allowance is $71,778,[1] which, if allowed, will cause a reduction of plaintiff's 1949 income tax in a proportionate amount and a refund will be in order.

The issues presented are (1) did the taxpayer possess the requisite economic interest in the mineral in place, and if it did; (2) what is the proper cutoff point in the processing of the mineral for determining the amount of the depletion deduction to be allowed?

THE FACTS

The pertinent facts need some elaboration. For over half a century plaintiff has been engaged in the manufacture of phosphate chemicals at its processing plant in Carteret, New Jersey. The basic raw material used by plaintiff is elemental phosphorus which, in 1944, was being produced by electric furnaces at the phosphate mines in Florida and Tennessee. Since these suppliers were also competitors of plaintiff, i. e., they were integrated producer-users, plaintiff was experiencing difficulty in obtaining elemental phosphorus. Plaintiff therefore decided in 1944 to commence production of its own elemental phosphorus and began investigating for deposits of phosphate shale. The deposits lay in Florida and Tennessee, which already were overcrowded, and the Intermountain Western States of Wyoming, Utah, Idaho and Montana. At that time there were no producers of elemental phosphorus outside Florida and Tennessee.

In late 1946 plaintiff was contacted by the Simplot Co. concerning phosphate deposits on the Fort Hall Indian Reservation near Pocatello, Idaho. Simplot was lessee of the mineral rights to this area and had been conducting mining operations since the summer of that year. Two distinct mineral deposits were located there, each in a separate layer in the ground. The lower layer was the more valuable mineral and was termed "phosphate rock." It assayed 30 percent or greater $P_2O_5$ and was directly usable in Simplot's fertilizer plant at Pocatello. The upper layer, which necessarily had to be extracted in order to mine the "rock," was termed "phosphate shale."[2] It contained less than 30 percent $P_2O_5$ and could only be used in the manufacture of fertilizer by first passing it through a very expensive middle process called "beneficiation." The only other feasible use for the shale was to process it in an electric furnace and produce liquid elemental phosphorus. This was also a very costly undertaking.

During the initial phases of mining by Simplot, the rock was transported to its fertilizer plant and the shale was piled on the surface near the mine. After several months of mining operations, it became evident to Simplot that a use

---

1. Alternatively, plaintiff claims deductions of $30,911, $7,334, or $5,893, depending on the cutoff point arrived at by the court. (Findings 126–129.)

2. Both the high grade "rock" and the low grade "shale" are included in the general classification of phosphate rock.

for the shale would have to be found in order to make the continued mining of rock economical. Simplot discussed financial arrangements with several companies concerning the construction of an electric furnace but was unsuccessful either in acquiring backing or in inducing someone else to build it. The cost of one furnace was estimated at between $2,500,000 and $3,500,000.

When plaintiff was contacted in late 1946, it sent its own mining engineers to Idaho to investigate the deposits. It was soon evident that several electric furnaces would need to be constructed to make the venture economically feasible, and that a minimum of 25 years' supply of shale would also be necessary to recoup the $10,000,000 to $20,000,000 investment. Simplot's and plaintiff's engineers, working together, determined that sufficient reserves were available in place to guarantee plaintiff sufficient shale input to four furnaces for at least 25 years. Once this was known, formal negotiations commenced between the two companies.

In the fall of 1946 when Simplot realized the need for an electric furnace, it had requested the Secretary of the Interior to lease additional lands up to 2,500 acres in order to secure the reserves necessary to warrant a multimillion dollar investment. Later, when it was known that plaintiff would be the one constructing the furnaces, the final details of the 25-year Indian leases were completed. Plaintiff played an important but unofficial part in these lease negotiations.[3]

The 1947 Indian leases called for a royalty of 30 cents per ton on the rock and 10 cents per ton on the shale. These were subject to adjustment to market price after 10 years. The lease was terminable if the lessee (Simplot) *or its associates* failed to install an electric furnace on or near the Indian Reserva-

tion within 15 years. Although the plaintiff was not named in these leases, it was understood by both the lessor (Indians) and the lessee (Simplot) that plaintiff would be the *associate* installing the furnaces, using the shale and paying the 10 cents per ton royalty to the lessor. At this time there was no other known deposit of shale which could economically be used in plaintiff's proposed furnaces. Therefore, plaintiff's furnaces, once constructed, would be entirely dependent upon the shale from Simplot's leases. Removal of this supply of shale would necessitate scrapping the entire investment by plaintiff.[4]

In November of 1947, 4 months after the Indian leases were completed, plaintiff and Simplot finalized their negotiations in an agreement entitled: "Agreement for purchase and sale of phosphatic shale from the Fort Hall Indian Reservation."[5] This agreement was submitted to and approved by the Assistant Secretary of the Interior. By its terms Simplot was to supply plaintiff all its requirements for shale in its furnaces at Pocatello. Plaintiff was restricted from producing fertilizer and Simplot, similarly, was restricted from selling or using phosphate for other than the production of fertilizers. The price for the shale was one dollar ($1.00) per ton and plaintiff was to pay the royalty directly to the lessor (Indians). Simplot was required to set aside reserves of phosphate to guarantee plaintiff a 25-year supply. These reserves could be increased whenever plaintiff installed more furnaces. If Simplot invaded these reserves in order to mine the rock, it had to store and preserve the shale for future use by plaintiff. These reserves would be released if plaintiff failed to construct its furnaces.

The Agreement between plaintiff and Simplot also allowed for plaintiff to take over the operation of the mine if Sim-

---

3. The taxpayer also leased an additional 2,500 acres, since the maximum Simplot could lease was 2,500 acres. This was to keep competition away. Taxpayer's leased lands have never been used. (Findings 34 and 44.)

4. Findings 41 and 96.

5. Finding 49.

plot either could not supply all of plaintiff's shale requirements, or increased the price, or invaded the reserve in order to sell to others and did not replace with other reserves within 20 days. These operations would be at plaintiff's expense but without any compensation or rental to Simplot. Royalties to the Indians would continue to be paid by plaintiff. Provisions were made to allow Simplot to regain possession of the mine whenever it was able to meet the conditions of the original Agreement. The Agreement was to remain in effect as long as the mining leases ran, and plaintiff had the right to correct any default by Simplot in order to keep the leases running.

During the negotiations between plaintiff and Simplot, plaintiff had offered to buy Simplot's interests in the mine and, alternatively, to form a joint venture. Simplot was unwilling to agree to either of these two approaches. A lease and sublease was impractical because the rock and shale could not be mined by separate parties. Only one mining operation was feasible.

Events have occurred as follows since the signing of the Indian leases and the Agreement between plaintiff and Simplot. By 1959 Simplot had invested over $4,500,000 in its fertilizer plant at Pocatello, and plaintiff had invested almost $21,000,000 in its four electric furnaces and related plant equipment. All of the shale processed in plaintiff's plant has been from the Simplot mine and by 1957 all the shale deposits under Simplot's leases had been reserved for plaintiff. Costs of exploration for reserves have been borne by both parties. No shale has been mined by Simplot and used by anyone other than plaintiff except by the consent of plaintiff. The costs of $1 per ton and the royalty have remained unchanged. In 1949, the year plaintiff commenced furnace operation, Simplot delivered over 180,000 tons of shale to plaintiff. By 1956 the annual supply was over 500,000 tons, with Simplot receiving over $500,000 and the Indians over $50,000 in royalties.

Simplot, by 1959, had spent almost $2,000,000 on the operation of the mine. Other expenses incurred in geological research of the area have been borne jointly. A railroad company was contacted by both plaintiff and Simplot in 1948 and induced to build a spur track at its own expense from the mine to the two plants near Pocatello.[6] The company was to be reimbursed 50 cents for each ton of rock or shale transported. Construction of the spur track was not economically feasible if only the rock were to be transported. Simplot's fertilizer plant used about 36,000 tons of rock each year, whereas plaintiff's four furnaces used about 500,000 tons of shale yearly. By 1954, plaintiff had paid the railroad over $1,000,000, compared to Simplot's $152,000.

If these facts add up to the possession by plaintiff of an "economic interest" in the phosphate shale in place, then a depletion allowance should be granted. Before considering the law on this point, however, one further fact should be noted. In 1957 Simplot and plaintiff entered into a supplemental agreement which superseded the terms of "purchase and sale" contained in the original 1947 Agreement. The effective date of this new Agreement was contingent upon the issuance of a ruling by the Internal Revenue Service that the new contract gave plaintiff a depletable economic interest in the shale. A ruling favorable to the plaintiff was made on October 8, 1957. Until then, plaintiff had not attempted to make deductions for depletion of the shale.

In the new Agreement of 1957 plaintiff was granted a sublease on the shale deposits in return for annual rental payments to Simplot. Simplot was to continue to mine both the rock and shale, but was now termed an "independent contractor," and would receive its mining costs from plaintiff. In essence, while the terms were altered, the substance of

6. Finding 81.

the Agreement remained unchanged. However, this does shed some light on the intent of the parties in their 1947 Agreement, and so will be referred to when "economic interest" is discussed.

### ECONOMIC INTEREST

■ Whether a taxpayer is to be allowed a deduction for depletion of mineral deposits is entirely a matter of legislative grace. Parsons v. Smith, 359 U.S. 215, 219, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959). The Corporation Tax Law of 1909, 36 Stat. 11, failed to provide for such a deduction and the hardship to mine operators resulting therefrom caused the Congress to make provision for a depletion deduction in the Revenue Law of 1913, 38 Stat. 114. United States v. Ludey, 274 U.S. 295, 302–303, 47 S.Ct. 608, 71 L.Ed. 1054 (1927). This deduction has been continued in all Revenue Acts since then. Commissioner of Internal Revenue v. Southwest Expl. Co., 350 U.S. 308, 312, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

The principle underlying the depletion allowance is the "recognition of the fact that the mineral deposits are wasting assets and [the deduction for the depletion] is intended as compensation to the owner for the part used up in production." Helvering v. Bankline Oil Co., 303 U.S. 362, 366, 58 S.Ct. 616, 618, 82 L.Ed. 897 (1938). This exclusion from gross income "is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired." Commissioner of Internal Revenue v. Southwest Expl. Co., supra, 350 U.S. at 312, 76 S.Ct. at 398. The reasoning behind depletion is thus very similar to that supporting deductions for depreciation in other types of property subject to wear and exhaustion. United States v. Ludey, supra, 274 U.S. at 303, 47 S.Ct. 608.

■ Since the depletion deduction was to allow the taxpayer to recover, by the time the mineral was completely exhausted, exactly his investment in the mine, Kirby Petroleum Co. v. Commissioner of Internal Revenue, 326 U.S. 599, 603, 66 S.Ct. 409, 90 L.Ed. 343 (1946), the first few Revenue Acts provided that the depletion allowance was to cease when the total deductions taken over the years added up to a sum equal to the original capital investment. The amount of the depletion deduction for any year was to be "reasonable" and it was left to the Commissioner of Internal Revenue to determine a proper formula. This manner of calculating depletion proved very difficult, and so in the 1926 Act, 44 Stat. 9, a flat allowance of a set percentage of gross income was adopted. Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 318, 55 S.Ct. 174, 79 L.Ed. 383 (1934), Kirby Petroleum Co. v. Commissioner of Internal Revenue, supra, 326 U.S. at 603, 66 S.Ct. 409. This fixed manner of calculating depletion deduction has been continued to the present day, even though the resultant deduction is not equal to nor sometimes even related to the capital investment in the mineral deposit. "[T]he taxpayer is not limited to a recoupment of his original investment [today]. The allowance continues so long as minerals are extracted, and even though no money was actually invested in the deposit." Commissioner of Internal Revenue v. Southwest Expl. Co., supra, 350 U.S. at 312, 76 S.Ct. at 398.

The determination of what parties involved in mining operations are entitled to the depletion deduction has become very difficult. The statute in Section 23(m)[7] calls for an equitable apportionment of the deduction between the lessor and lessee. Whether others can share in the deduction is not stated. In fact, not until the 1918 Revenue Act, 40 Stat. 1057, did the Congress expressly state

7. The applicable statute involved for the tax year in question is the Internal Revenue Code of 1939, Secs. 23(m) and 114, 53 Stat. 1, 14, 45, as amended, Ch. 63, Sec. 124, 58 Stat. 21, 44 (1943), as amended, Ch. 515, Sec. 15, 61 Stat. 917, 919 (1947).

that a lessor and lessee should share the depletion deduction. Because of this lack of explicitness in the statute, the Supreme Court over the years has found it necessary to apply various fact situations to the statute language. A study of some of these decisions is helpful.

One of the first Supreme Court decisions dealing on this point was Lynch v. Alworth-Stephens Co., 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660 (1925). There, the taxpayer was lessee of iron ore deposits and desired to take depletion deductions on his gross income (the royalties he received from a sublessee) minus the royalties he paid to the lessor-fee owner. The applicable statute at that time, Section 12(a) of the Revenue Act of 1916, 39 Stat. 756, 768, provided for "[a] reasonable allowance for the exhaustion * * * of *property*" [emphasis added], and made no mention of apportionment between lessor and lessee. The Court construed *property* as meaning a "real and substantial interest [in the mineral deposits]," (at 369, 45 S.Ct. at 275), and not merely legal title therein.

This "broadening" of the relationship of taxpayer-to-mineral-deposit from the possible *restricted connotation* in the Revenue Acts, was added to in Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). The Court was there concerned with the relationship of a transferor of oil leases who received as consideration for the transfer certain fixed amounts plus a continuing *royalty* of one-eighth of all oil produced. There was no lease here as there had been in Lynch and in Murphy Oil Co. v. Burnet, 287 U.S. 299, 53 S.Ct. 161, 77 L.Ed. 318 (1932); the decision in the latter case holding that both bonus and royalty payments are depletable. The Court in Palmer ruled that the granting or denying of a depletion allowance is not dependent on "the particular legal form of the taxpayer's interest in the property

* * *." [287 U.S. at 557, 53 S.Ct. at 226.] Whether the taxpayer leases the property, or assigns it, or transfers it in some other manner, is immaterial. The statute does not confine "depletion allowances to [only] those who are technically lessors." [At 556, 53 S.Ct. at 226.]

> The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil [mineral] in place, and secures, by any form of legal relationship, income derived from the extraction of the oil [mineral], to which he must look for a return of his capital. [At 557, 53 S.Ct. at 226.]

This economic interest [at 557, 53 S.Ct. 225] test developed by the Court in Palmer has been the rule used in all subsequent depletion cases.[8] It has also been adopted by the Commissioner in his Treasury Regulations.[9] This rule boils down to two tests for economic interest: (1) A capital investment in the mineral in place, and (2) a return on the investment which is realized solely from the extraction of the mineral.

Since the Palmer opinion, most decisions ruling for a depletable interest have involved instances where the taxpayer "has once had at least a fee or leasehold in the [property]." Commissioner of Internal Revenue v. Southwest Expl. Co., 350 U.S. 308, 315, 76 S.Ct. 395, 399, 100 L.Ed. 347 (1956). It is fairly obvious that a taxpayer can get in a position where he must look solely to the extraction of the mineral for a return on his investment, and yet not possess a lease or title. But, can the same taxpayer meet the other test requirement of Palmer and the Treasury Regulations if his investment is not in a lease or title to the property?

In Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897

---

8. See Parsons v. Smith, 359 U.S. 215, 221, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959), for a note on the various opinions since Palmer.

9. Treasury Regulations 111, sec. 29.23(m)–1 (1941), as amended, T.D. 6031, 1953–2 Cum.Bull. 120.

(1938), the Court ruled that a gasoline processor that receives its natural gas via its own pipelines running from the wellheads, and pays royalties to the well owners, has no economic interest in the gas in place, but merely an economic advantage acquired "through a contractual relation to the owner, * * *." [At 367, 58 S.Ct. at 618] The taxpayer did not meet either of the two tests; it could not compel production of gas at the well (i. e., no investment in the oil), and was not entirely dependent upon the gas well in question for a return on its investment.[10] Thus, in Bankline, the taxpayer's *lack of control over production of the mineral* became one of the prime tests for determining whether it possesses an *economic interest in the mineral.*

The next case after Bankline dealing with taxpayers who have never possessed either a fee or leasehold interest in the property, was Commissioner of Internal Revenue v. Southwest Expl. Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956). This is the leading case in which the Court has found an economic interest to exist under these circumstances. However, in Southwest the facts were very unique and the Court was careful to limit its expansion of the Palmer concept to cover just these unique facts.[11] The State of California required by law that all drilling for offshore oil must be done from filled lands or from upland sites and that permission from the upland owners was necessary to acquire a lease from the State. Southwest Exploration Company obtained a lease from the State to drill from specified upland sites, the upland owners having agreed to this use of their land in consideration of royalties from all future oil production. There were no filled lands available and so, without the consent of the upland

owners, there could be "no bid, no lease, no wells and no production." [At 315, 76 S.Ct. at 399.] The State also could cancel the lease if Southwest defaulted in any of the conditions, including those with the upland owners.

The Court termed the upland owners as being "essential parties to any drilling operations." Their "controlling position" over production was the drilling site which they could have sold but, instead, kept as their investment in the *oil in place.* They had to look solely to the oil production for a return on their investment and so met both tests of Palmer and the Treasury Regulations. Therefore, Southwest and the upland owners were required to share the depletion allowance.

Since the decision in Southwest, the Court has considered two cases in which the facts were more near those of Bankline than Southwest, and consequently, has ruled *against* a presence of an economic interest in both instances. Both cases involved owners or lessees of coal mines who had contracted with certain independent mine operators to have the operators mine the coal at their own expense and deliver it to the owner or lessee for a fixed sum. In the first of these cases, Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959), the contracts "were completely terminable without cause on short notice" [at 224, 79 S.Ct. at 662], and all the investment of the operators was in their equipment which was movable and so not susceptible to scrapping if the mine closed down.

In Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965), underground mining instead of strip mining was involved and so the expense

10. In the Tax Court opinion, 33 B.T.A. 910 (1936), it was stated that Bankline would probably have installed its extensive gasoline plant regardless of whether the gas well in question was available or not.

11. "We decide only that where, in the circumstances of this case, a party essential to the drilling for an extraction of oil has

made an indispensable contribution of the use of real property adjacent to the oil deposits in return for a share in the net profits from the production of oil, that party has an economic interest which entitles him to depletion on the income thus received." 350 U.S. 308, 317, 76 S.Ct. 395, 400 (1956).

to the operators was greater than in Parsons and less of their investment was recoverable on termination. However, all the equipment was movable, all royalties were paid by the lessee, and the coal was delivered to the lessee. The operators had no obligation to continue mining—whether the lessee could terminate as in Parsons was disputed. The lessee also controlled the price paid for the coal delivered. In both cases, the mine operators looked to the owner or lessee for a return on their investment, not to the sale of the coal.

Therefore, in both Parsons and Paragon the taxpayer failed to meet either of the two tests of economic interest. Although in both instances the operator conceivably had more invested and was taking a greater risk than the owner or lessee,[12] nevertheless the relationship of the operators to the coal in place was not strong enough.

We feel that the facts in the instant case are stronger on the issue of economic interest than even those present in Southwest, and we therefore find that the taxpayer, Food Machinery, has an economic interest in the phosphate shale in place. Our conclusion is based on the following enumerated circumstances which show conclusively that the taxpayer here has met both tests of economic interest—(1) capital investment in the mineral [shale], and (2) return on the investment based solely on the extraction of the shale.

The circumstances are these: (1) The decision of the taxpayer to construct the electric furnaces was the *sine qua non* of the mining of the shale by Simplot. This was as essential an element to the mining process as the agreement of the upland owners in Southwest, and was equally as irreplaceable. In both Parsons and Paragon other operators were available and so they were not essential parties. (2) The taxpayer had reserves in the shale in place for 25 years. It could compel production of this shale and prevent sales of it to anyone else.[13] (3) The lease by Simplot was terminable by the Indians if the taxpayer did not construct the electric furnaces. (4) The price paid by taxpayer to Simplot for the shale was not the market price but rather a fixed amount which covered mining expenses plus a 10 percent profit. (5) The taxpayer had its own geologists participate in studies of the mine and shared in various exploratory expenses. (6) The investment by the taxpayer in the electric furnaces and the payments to the railroad far exceeded the investment by Simplot. (7) The taxpayer was required to look solely to the shale in Simplot's mine for a return on its $20,000,000 investment. There was no other supply of shale economically possible, and these multimillion dollar furnaces would need to be scrapped if the shale in the Simplot mine disappeared. (8) Simplot's investment in the mine was dependent upon the taxpayer's continued use of the shale. (9) The taxpayer paid royalties on the shale directly to the lessors and not via the lessee Simplot.

■ Can it be thought for a moment that any reasonable businessman would invest $20,000,000 in four huge immovable electric furnaces at a site completely isolated from all sources of raw input except one, and not first secure an ironclad guarantee to that lone raw input! We feel that this comprises a requisite capital investment in the mineral and is in line with the economic interest rule

12. See the dissent in Paragon by Mr. Justice Goldberg, in which Mr. Justice Black joined.

13. The trial commissioner's finding 66, which the court adopts, states:
"The 1948 Simplot agreement was cast in terms of sale by Simplot and purchase by plaintiff of tonnages of furnace grade shale, but the substance of such agreement was that plaintiff thereby acquired reserves of furnace grade shale in place, to be mined and delivered by Simplot to plaintiff at a 'price' covering Simplot's mining costs thereof, plus a 10 percent profit, with Indian royalties on such shale payable by plaintiff."

as laid down in Palmer and all the cases thereafter.[14]

The change in the agreement between Simplot and the taxpayer in 1957, and the favorable ruling by the Commissioner on depletable interest which the taxpayer acquired therefrom, we feel are insignificant in reaching our conclusion for the 1949 tax year. Whether the taxpayer thought it had a depletable interest prior to 1957, and whether the 1957 agreement significantly altered the essentials of the 1947 agreement (we feel it did not), cannot be given much weight. It does bear on the intent of the parties but, we feel, in this case the intent *at the time* (1949) is conclusively made apparent from the facts present then.

## DEPLETION CUTOFF POINT

It now becomes necessary to determine the proper cutoff point for calculating the depletion deduction—the fine line where the mining process ceases and the manufacturing process begins. This point can be any one of four places: the rough shale loaded in gondola cars at the Simplot mine, the rough shale loaded in the kiln feed bins at plaintiff's plant, the nodulized shale prior to entry into the electric furnaces, and the liquid elemental phosphate loaded in tank cars outside the plant.

Section 114(b) (4) of the Internal Revenue Act of 1939 [15] provides that the percentage depletion for "phosphate rock" [16] shall be 15 percent "of the gross income from the property," and Section 114(b) (4) (B) further defines gross income from property as that derived "from mining." The term "mining" is defined as including "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products."

This subsection lists some "ordinary treatment processes" but does not include any for phosphate rock. (This includes rock and shale.) It becomes necessary, therefore, to determine the ordinary treatment process for the mineral involved in this case—phosphate shale.

The Supreme Court has handed down several important decisions in this area. The landmark case is that of United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960). The taxpayer there was an integrated miner-manufacturer of clay pipes produced from fire clay and shale. There was a substantial market for the fire clay and shale in the vicinity but the taxpayer could only make profitable sales on the finished product—clay sewer pipes. Fire clay and shale were not enumerated in the Revenue Act [Sec. 114(b) (4) (B)] as having a specific ordinary treatment process. The Court

14. This holding is not in conflict with our recent decision in Tidewater Oil Co. v. United States, Ct.Cl., 339 F.2d 633, decided December 11, 1964. Determinations on tax depletion are made "according to the peculiar conditions in each case * * *." Section 23(m), Internal Revenue Code 1939. "[I]t is impossible to escape nice distinctions in the application of complicated tax legislation." Mr. Justice Frankfurter's separate opinion in Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 328 U.S. 25, 38, 66 S.Ct. 861, 868, 90 L.Ed. 1062 (1946). The lack of an economic interest in Tidewater was based on several facts which are distinguishable from the instant case: (1) The assignor received none of the oil produced. (2) The investment of the assignors was not necessarily depleted when the transferred allowables were produced. (3) The contribution of the assignor was not essential to continued production, nor to the acquisition of the lease. (4) The interest of the assignor was not measured by the productive life of the oil well. (5) And most important, the assignor did not possess a $20,000,000 investment that was essential to the oil production and that depended for its very existence on the oil in place.

15. See footnote 7.

16. The term "phosphate rock" used in the Tax Statute is the general classification and it comprises both "rock" and "shale."

noted, however, that of the four categories of permissible processes, none of them "destroy the physical or chemical identity of the minerals or permit them to be transformed into new products." [At 86, 80 S.Ct. at 1586.] The Court then concluded, "that Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles." [At 86, 80 S.Ct. at 1586.]

In applying the facts to the conclusions of law, the Court determined that the vast sales of the raw product—fire clay and shale—in the vicinity was conclusive of the "commercial marketability of the product" in its raw state. The Court further stated that this proof of marketability was not significant in showing that the taxpayer could sell the raw product profitably—which he could not do— "but" because these sales demonstrated that the raw product was in a state "ready for industrial use or consumption" and had thus passed the mining stage.

■ It was further stated that the Congress intended for all miners of the same product to be treated similarly as to depletion allowances. This applies whether they are integrated miner-manufacturers or merely miners. This meant that the taxpayer's depletion allowance was to be governed by the ordinary processes applied by the nonintegrated miners prior to sale.

In Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963), the Court in a per curiam opinion held that the cut-off point for an integrated miner-manufacturer of cement was the value of the limestone rather than the finished cement. There were substantial sales of limestone in the vicinity as in Cannelton and the Court stated that Cannelton placed the cutoff point "at the point where the mineral first became suitable for industrial use or consumption." [At 538, 83 S.Ct. at 379.]

■■ The law concerning cutoff therefore appears to place the "line" at the place where the mineral first becomes fit for "industrial use or consumption." This is measured on an industry-wide basis to afford an equitable treatment to all similarly situated taxpayers. The best test for determining when a mineral is fit for "industrial use or consumption" is its marketability by other producers who are nonintegrated. However, when there are no other producers of any significance in the market area, then other tests must be utilized in determining "readiness for industrial use or consumption." Turning to the statute and the opinion in Cannelton, it appears that one test is "where does the mineral undergo its first chemical or physical change." This test also seems reasonably in line with the ordinary meaning of the phrase "mineral product."

Turning once again to the controversy at hand, the facts show that there were no significant sales of low-grade phosphate rock (shale) in the vicinity or elsewhere during the tax year.[17] No quotations existed for that type of mineral. The only use for shale was as input to an electric furnace to produce liquid elemental phosphate. This liquid was then marketable and usable in chemical plants to produce various chemical products. No market existed for the mineral in any of the stages prior to the elemental phosphate. The only other producers of elemental phosphate from shale were located in distant Florida and Tennessee.

If the Supreme Court in Cannelton used the evidence of substantial marketability as the sole determiner of "suitability for industrial use or consumption," then the liquid elemental phosphate is the proper cutoff point between mining and manufacturing in this case. However, as previously stated, this is not our interpretation of that decision.

17. In 1947 and 1948, the Simplot Company sold a mixture of rock and shale to the U.S. Army to manufacture fertilizer.

In construing the ordinary treatment processes enumerated in the Revenue Act, we point out again that the Court in Cannelton found that none of them allowed a process that would change the physical or chemical make-up of the product. Also important in construing the statutory meaning is the "exclusion" in part (iv) of enumerated processes of "thermal or electric smelting, or refining," as allowable processes. This, of course, does not refer specifically to phosphate rock but it does apply to "ores which are not customarily sold in the form of the crude mineral product." It is proper to study these enumerated processes, even though not directly applicable to the mining of phosphate rock, in order to gain an insight into the congressional intent for the entire section.

Another factor of possible significance in determining congressional intent in the processing of phosphate rock is that in the Internal Revenue Act of 1954, 68-A Stat. 3,210, Sec. 613(c) (4) (E), an ordinary treatment process for that mineral appeared. It was listed as "the sintering and nodulizing of phosphate rock." Nodulizing is the intermediate process wherein the chunks of rough shale are passed through a rotating kiln and heated. This process causes a physical change in that it melts the surface slightly and hardens it. This nodulizing process makes the shale suitable for processing in the electric furnaces. A chemical change also occurs in nodulizing in that fluorine is released from the fluorapatite compound in the shale, leaving tricalcium phosphate. There was no market for these nodules either.

The resulting nodules are then mixed with coke and silica (85 percent nodules, 10 percent coke, and 5 percent silica) and processed in an electric furnace where the phosphorus is released in a gaseous state. It is then cooled to a liquid and shipped to the plaintiff's chemical plant in New Jersey. There is a chemical and physical change in this "reduction and thermal or electric smelting process."

Since both chemical and physical changes occur during nodulizing and electric furnace processing, these processes must be construed as being *outside* the "ordinary treatment process of miners." The fact that the Congress saw fit in 1954 to change the law is not a controlling factor in our construction of its intent in the 1939 Code.

The remaining possible cutoff points are the rough shale loaded in gondola cars at the Simplot mine, and the same shale loaded in kiln feed bins at the taxpayer's Pocatello plant. In both these instances the shale has been crushed and screened to limit the size to three (3) inches. The only difference is the 21 miles of hauling from the mine to the furnaces.

■ We find that the shale at the mine was ready for industrial use or consumption as evidenced by its use in the taxpayer's plant. The transportation of the shale from the mine to the plant occurred after the mineral was ready for industrial use or consumption and so was part of the post-mining process. The cutoff point where gross income from mining ceases " 'has been the same' ever since the first depletion statute, namely, 'where the ordinary miner shipped the product of his mine.' " Riddell, at 539, 83 S.Ct. at 379. This is the shale loaded "at the mine." [18]

Since the parties have stipulated on the amount of the depletion allowance for all four possible cutoff points, it be-

18. The Eighth Circuit has recently ruled in United States v. Light Aggregates, Inc., 15 AFTR 2d 674 (1965), that actual marketability is not a prerequisite in determining the cutoff point where the mining process ends. However, whether the cutoff point should be the rough mineral *at the mine* or at the *manufacturing plant* was not in issue. The Commissioner placed the cut off at *the plant* and the taxpayer placed it at the value of the finished product. In United States v. Portland Cement Co. of Utah, 338 F.2d 798 (1964), the issue was raised whether the cutoff should be *at the mine* or *at the manufacturing plant*. The Tenth Circuit decided on the value of the raw mineral *at the mine*.

comes unnecessary to consider whether Simplot and the taxpayer should share in the depletion of the shale, and what each proportionate share should be.

The proportionate profits method will be used in determining the value of the shale at the mine.

Accordingly, judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c) (2) of the Rules of this court.