295 F.2d 623
 Gordon K. GRIMES, individually and as surviving husband and Executor of the Estate of Lillian M. Grimes, deceased, Appellant,
v.
UNITED STATES of America, Appellee.
UNITED STATES of America, Appellant,
v.
C. A. McCARRELL, Appellee.
 No. 17129.
 United States Court of Appeals Ninth Circuit.
 October 3, 1961.
 
 Earl Platt, St. Johns, Ariz., Joseph L. Wyatt, Jr., of Brady, Nossaman & Walker, Los Angeles, Cal., for appellee McCarrell and appellant Grimes.
 Louis F. Oberdorder, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney and Kenneth E. Levin, Dept. of Justice, Washington, D. C., and C. A. Muecke, U. S. Atty., Phoenix, Ariz., for appellant and appellee U. S.
 Hilbert P. Zarky, Los Angeles, Cal., and Mitchell, Silberberg & Knupp, Los Angeles, Cal., of counsel, for Filtrol Corp., as amicus curiae.
 Before CHAMBERS and MERRILL, Circuit Judges, and KILKENNY, District Judge.
 MERRILL, Circuit Judge.
 
 
 1
 Alleging overpayment, taxpayers Grimes and McCarrell have instituted this suit against the United States for recovery of 1953 income taxes paid by them.
 
 
 2
 Grimes and McCarrell, as partners, contracted with the owners of a deposit of bentonite to engage in the extraction of that material. The material so extracted was subsequently sold by the owners. Grimes and McCarrell realized a net profit from their extraction operations and claimed a percentage depletion allowance upon that profit.[1]
 
 
 3
 The district court rejected Grimes' claim to depletion allowance upon the ground that he had no economic interest in the deposit. Grimes has taken an appeal from that judgment. The district court, finding that McCarrell had an economic interest independent of his extraction operation, allowed him to take depletion upon the income in question. The United States has appealed from that judgment.
 
 
 4
 As to Grimes, the question presented is whether, under the circumstances of this case, one engaged under contract in the removal of clay has an economic interest in the deposit. We have concluded that he has not and that upon the appeal of Grimes judgment must be affirmed.
 
 
 5
 As to McCarrell, the question, as we view it, is whether a taxpayer who has an economic interest in a clay deposit and who derives net income from an enterprise of extraction (as distinguished from sale) of the clay may take percentage depletion upon that income. We have concluded that he may and that upon the appeal of the United States judgment must be affirmed.
 
 
 6
 The clay deposits here involved are deposits of bentonite located in Arizona. Some of the land is owned in fee by McCarrell and one Gurley. Other land is held by McCarrell and Gurley under lease from the Santa Fe Pacific Railroad Company. McCarrell and Gurley had entered into a contract with Filtrol Corporation of Los Angeles, California, to sell to Filtrol all material mined from the property during the period of the agreement, January 1, 1950, to December 31, 1959. It was not contemplated that the co-owners would personally mine the material to be delivered to Filtrol, but that to perform this service they would appoint an independent mining contractor satisfactory to Filtrol.
 
 
 7
 For the material so sold Filtrol agreed to pay the following: royalties and any other charges payable by McCarrell and Gurley to Santa Fe as lessor; taxes and expenses accruing to McCarrell and Gurley by reason of their holding of the leases; the amount payable by McCarrell and Gurley to the independent contractor; as profit to McCarrell and Gurley, a fee of 30 cents per ton on the first 100,000 tons of material delivered to Filtrol and 20 cents per ton on all material in excess of 100,000 tons. With respect to the lands owned by McCarrell and Gurley in fee, they were to receive the same consideration except that the amount of the royalties payable to Santa Fe on the leased premises (10 cents per ton) would accrue to McCarrell and Gurley on the land they owned in fee.
 
 
 8
 McCarrell himself, in his individual capacity, was named as independent contractor to mine the material. As compensation it was agreed by the co-owners that he should receive his cost of operations, including actual cost for subcontracting and a fixed fee per operating hour for the use of his machinery and equipment plus a fixed fee of $5,400.00 per year for his services. To obtain the necessary equipment, McCarrell himself entered into a subcontract with a partnership consisting of himself and Grimes for the performance of all operations requiring the use of heavy equipment.
 
 
 9
 This partnership, upon its income tax return for 1953, claimed a depletion allowance to the extent of $57,134.23, being fifty per cent of its net income. McCarrell further claimed a depletion allowance to the extent of fifty per cent of his net profit from his additional operations as contractor. These depletion allowances claimed by McCarrell individually and by the partnership of McCarrell and Grimes were disallowed by the commissioner. The claimed tax deficiencies were paid by McCarrell and Grimes and this action was brought to recover overpayments: $34,519.56 sought by McCarrell and $22,195.20 sought by Grimes.
 
 
 10
 The district court upheld the commissioner as to Grimes upon the ground that he had no economic interest in the deposit. It granted judgment in favor of McCarrell in the amount sought.
 
 
 11
 As to Grimes the district court was clearly correct. The partnership was merely engaged in renting out heavy equipment and operating it at an hourly rate to remove overburden or do other work at the mine site requiring heavy machinery. The partnership's investment was in its equipment and not in the bentonite in place. Parsons v. Smith, 1959, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed. 2d 747. Its investment in equipment was recoverable through depreciation.
 
 
 12
 Grimes contends that two facts distinguish his case from that of the usual mine stripper and give him a direct equity in the deposit: first, his possession under Arizona law of a lienor's interest in the actual mineral; second, his position as member of a mining partnership which, under Arizona law, could be terminated only by agreement.
 
 
 13
 Neither of these facts serves to give him any economic interest in the deposit or economic concern with its wasting. The facts that the mine stands as security for the payment of sums due him and that his security is being depleted can hardly constitute payment upon the secured debt a return of invested capital. The fact that the partnership cannot be terminated without agreement may render him secure in his status as partner but can hardly vest the partnership with any greater interest in the mine than that which its contract creates.
 
 
 14
 With reference to the judgment in favor of McCarrell, we accept the following statement in the brief of the United States, as appellant, as presenting its position as to the rights of McCarrell:
 
 
 15
 "McCarrell as a landholder is entitled to a depletion deduction to the extent of 15 per cent of his gross income from the property, but not to exceed 50 per cent of his net income from the property. Gurley is entitled to the same. McCarrell's and Gurley's gross income from the property was the consideration which they received from Filtrol pursuant to their contract to sell bentonite to Filtrol. This consideration was spelled out in the sales contract to include the royalties payable to Santa Fe, all taxes incurred except personal income taxes, mining costs payable to a contractor, and a profit of 30 cents or 40 cents per ton of bentonite delivered to Filtrol. Thus, as the District Court found, all sums paid by Filtrol in 1953 constituted the amount for which Bentonite was sold to Filtrol, and this was McCarrell's and Gurley's gross income from the property. Each was entitled to a depletion deduction based on 15 per cent of his half of the gross income. Of this gross income, however, only 30 cents or 40 cents per ton profit was actually net income. The rest was paid out by McCarrell and Gurley as expense. Since the Statute limits the allowance to 50 per cent of the net income from the property, the most that McCarrell can deduct is 50 per cent of his half of the 30 cents or 40 cents per ton profit."
 
 
 16
 The government's breakdown on this basis is also set forth in its brief as follows:
 
 
 17
 McCarrell's costs as independent
 contractor ................................ $219,392.98
 Costs of McCarrell-Grimes partnership
 as subcontractor .......................... 380,894.86
 Royalties paid to McCarrell ................... 22,684.82
 Royalties paid to Gurley ...................... 22,684.82
 ___________
 Total depletible gross income of McCarrell
 and Gurley ................................ $645,657.48
 McCarrell's depletion allowance (15%
 of one-half of the total gross) ........... $ 48,424.30
 Limited, however, to one-half of McCarrell's
 net ....................................... $ 11,342.41[2]
 
 
 18
 The difficulty with the government's formula is that it proceeds upon the assumption that, for tax purposes, Ownership constitutes an entity wholly distinct and apart from that of the contractor and subcontractor; and that the subcontracting partnership, for tax purposes, constitutes an entity wholly distinct and apart from that of the contractor and Ownership. Were this so, there would be merit in the contentions that only Ownership can here assert an economic interest and that the payments to the contractor and subcontractor must be deducted in full in order to ascertain Ownership's net income.
 
 
 19
 But neither Ownership nor the partnership is, in this case, a distinct taxable entity. The entity with which we are concerned is the taxpayer and he does possess an economic interest. It is, then, the taxpayer's gross income and the taxpayer's net income which are relevant, and under the regulations (Footnote 1) the taxpayer's net income is ascertained by deducting from his gross income the allowable expenses which he has incurred. When these deductions are made, the income in question is left. It is taxable income of this taxpayer: the taxable residue of his "gross income from the property." It is, then, "net income of the taxpayer * * * from the property" under the Code and the Regulations.
 
 
 20
 The government protests that this result is absurd in the light of the purpose of the depletion allowance to serve as return of capital in the case of wasting assets. It asserts that the income in question results not from any investment in the mine, but from investment in equipment, as to which return of capital has already been reflected in depreciation.
 
 
 21
 This may well be so. The same argument could be made with equal validity, however, were McCarrell the sole owner of both mine and machinery. Indeed, a similar argument might be made as to income attributable not to the value of mineral in place but to the labor of the miner in extracting it. Yet neither the code nor the regulations contemplates that in ascertaining that income to which percentage depletion shall apply, the taxpayer must deduct from his income the reasonable rental value of equipment owned and used by him and the reasonable value of his services. If we seem here to have strayed from the original concept of return of capital, we can but say that the concept of percentage depletion has put us on this path and that the regulations' definitions of gross and net income have firmly held us to it.
 
 
 22
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Section 114(b) (4) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114 (b) (4) (A), with reference to percentage depletion provides:
 "The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be —
 * * * * *
 "(iii) in the case of * * * bentonite * * * 15 per centum,
 * * * * *
 "of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property * *."
 Treasury Regulation 118, § 39.23(m)-1 (e), provides in part:
 "(2) In the case of a crude mineral product other than oil and gas, `gross income from the property,' as used in section 114(b) (4) (A), means the gross income from mining. The term `mining' as used herein includes not only the extraction of ores or minerals from the ground but also the ordinary treatment processes which are normally applied by the mine owners or operators to the crude mineral product after extraction in order to obtain the commercially marketable mineral product or products. * * *
 "(3) If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, `gross income from the property' means the amount for which such product was sold * * *."
 Section 39.23(m)-1(g) provides in part:
 "`Net income of the taxpayer (computed without allowance for depletion) from the property,' as used in section 114(b) (2), (3), and (4) and §§ 39.23 (m)-1 to 39.23(m)-19, inclusive, means the `gross income from the property,' as defined in paragraph (e) of this section, less the allowable deductions attributable to the mineral property upon which the depletion is claimed * * * including overhead and operating expenses, development costs properly charged to expense or allowable as deductions under section 23(cc), depreciation, taxes, losses sustained, etc., but excluding any allowance for depletion."
 
 
 [2]
 The United States has presented an alternative to its position as here stated. It contends that, under the circumstances of this case, the economic interest of McCarrell and Gurley in the property is limited to the cash sums received by them from Filtrol; that Filtrol must be regarded as lessee rather than purchaser and that the sums received by McCarrell and Gurley are in the nature of rentals or royalties. Filtrol, appearing as amicus curiae, enthusiastically supports this position
 However, the United States explicitly made concessions to the contrary in the district court. We conclude, therefore, that no issue in this respect is properly a part of the case before us.