Per Curiam :
Plaintiff brought this suit to recover Federal income taxes for the years 1953 through 1957, seeking to recover the partial disallowance of its depletion deductions at the Cheto mine and the amount by which its depletable gross income, which represented the cost of containers, was reduced by the Commissioner of Internal Revenue. The issue relating to container costs was abandoned prior to trial. In its amended answer, the defendant raised two defenses by way of set-off: (1) plaintiff had no economic interest in the Cheto mine; and (2) plaintiff had taken excess depletion on all of its mines because it had used an end-product cutoff point.
After a lengthy trial before our former trial judge, James F. Davis, the trial judge filed his opinion, findings of fact, and recommended conclusion of law in which all issues were determined in favor of the defendant.
On August 30,1973, after plaintiff had filed its exceptions to the trial judge’s findings of fact, and both parties had filed their briefs to the court, plaintiff filed a motion to dismiss its petition with prejudice. Alternatively, plaintiff withdrew its Notice of Intention to Except to those findings of fact which relate to the economic interest issue, and moved the court to adopt such findings of fact, the trial judge’s opinion relating to the economic interest issue, and his recommended conclusion of law.
*34 After hearing oral argument on the motion to dismiss and on the merits, the court finds that the granting of plaintiff’s motion to dismiss at this stage in the proceedings would be prejudicial to defendant and, in the exercise of discretion, the court denies the motion. Stevenson v. United States, 197 F. Supp. 355 (M.D. Term. 1961). See also Church of Scientology of Hawaii v. United States, 485 F. 2d 313 (9th Cir. 1973), and cases cited therein.
However, the court concludes that the granting of plaintiff’s alternative motion would not prejudice defendant’s rights. Such action gives defendant the benefit of an opinion and detailed findings of fact on the economic interest issue and forecloses plaintiff’s right to recover on any of the grounds alleged in the petition. It is therefore unnecessary for the court to reach or consider the issue raised by defendant’s plea of set-off that plaintiff had taken excess depletion on all of its mines because it had used an end-product cutoff point.
Therefore, the court affirms and adopts the trial judge’s Findings of Fact 1 through 13, 16 through 29, and 31, his opinion on the economic interest issue, and his recommended conclusion of law. Accordingly, the court concludes that plaintiff is not entitled to recover and its petition is hereby dismissed.
OPINION OP TRIAL JUDGE
Davis, Tried Judge:
The “economic interest” issue
Section 23 (m) of the 1939 Code and § 611(a) of the 1954 Code provide that the owner of “mines * * * [and] other natural deposits” shall be entitled to a “reasonable allowance for depletion * * * according to the particular conditions of each case.” Treas. Reg. 118, § 39.23(m)-l [1939 Code], and Treas. Reg. 1.611-1 (b) [1954 Code] provide that the depletion deduction is allowable to the owner of an “economic interest” in mineral deposits, but not to one who has only an “economic advantage derived from production.” Treas. Reg. 118, § 39.23(m)-l states in pertinent part:
(b) * * * An economic interest is possessed in every case m which the taxpayer has acquired, by investment, any interest in mineral in place * * * and secures, by *35 any form of legal relationship, income derived from the * * * sale of the mineral * * *, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit * * * does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production. Thus, an agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a de-pletable economic interest.
The “economic interest” concept had its genesis in Palmer v. Bender, 287 U.S. 551 (1933), and that concept has been elaborated upon and refined in a host of judicial decisions, among others Commissioner v. Southwest Exploration Co., 350 U.S. 308 (1956), and Helvering v. Bankline Oil Co., 303 U.S. 362 (1938).
When a taxpayer is the owner in fee or a lessee of mineral property, few problems arise since the Code expressly provides that the depletion deduction “shall be equitably apportioned between the lessor and lessee.” Most difficulties stem from situations where the taxpayer is not an owner in fee or a lessee, but rather has some contractual relationship with one or the other of the owner or lessee (or both) which the taxpayer contends amounts to an “economic interest.” Such is the case here.
During the years in issue, plaintiff acquired some of its calcium bentonite clay from the Cheto mine in Arizona. The Cheto bentonite was shipped to Vernon or Jackson for processing. Prior to the 1950’s (particularly in the 1920’s and 1930’s), plaintiff obtained bentonite from the Chambers mine, near the Cheto property. In the late 1930’s, plaintiff’s geologists and mining engineers discovered the Cheto deposit and found the clay to be suitable for plaintiff’s use. The mining contractor at the Chambers mine (MoCarrell) thereafter obtained leases (along with his co-lessee Gurley) to the Cheto property from the Santa Fe Pacific Bailroad Company, which owned the land in fee. McCarrell then moved his mining operations to the Cheto mine and commenced mining Cheto clay which was disposed of to plaintiff and others. *36 Later, McCarrell and Gurley acquired ownership in fee to some Cheto property.
In 1944, McCarrell and Gurley entered into an agreement with plaintiff whereby McCarrell and Gurley agreed to conduct mining operations and plaintiff agreed, in essence, to purchase the mined clay and to compensate McCarrell and Gurley on the basis of actual costs of mining plus a per-ton fee for clay mined. Included in the payment was a 10-cents-per-ton royalty, to be paid to Santa Fe, the lessor. In 1949, a new agreement was entered into, much like the 1944 agreement. The details of the 1949 agreement and the operations thereunder are set out in findings 20-29. In essence, McCar-rell became the mining contractor by agreement with his co-lessee Gurley, and plaintiff had exclusive rights to certain of the mined clay on a mining cost-plus-fee basis. McCarrell and Gurley continued, however, to sell Cheto clay to others from property not covered by agreement with plaintiff. During the 1950’s problems developed between plaintiff and McCarrell (findings 25-28) which ultimately resulted in plaintiff’s getting leases to part of the Cheto property directly from Santa Fe in 1963 and 1964.
Defendant contends that plaintiff’s 1949 agreement with the lessees was simply an exclusive sales contract and gave rise to nothing more than an “economic advantage” in the Cheto clay, rather than a depleta'ble “economic interest.” Plaintiff, on the other hand, says that its relationship with the lessees, lessor and the mining contractor was such that it was the “real party in interest” to the lease and that, accordingly, it acquired, by investment, an interest in the clay mineral in place. Plaintiff says that it was the real party in lease negotiations between McCarrell and Gurley, and Santa Fe; that the lease was granted to McCarrell and Gurley simply as accommodation parties; and that it had a substantial investment in the clay in place, both financially and through control of the mining. In particular, plaintiff says that it exercised such control over mining that it was the lessee in fact, and that its expenditures for research and development of Cheto clay, as well as expenditures on roads *37 and the like at the mine, constituted a substantial investment in the clay mineral in place.
The record supports defendant and establishes the following:
(a) Filtrol was not owner, lessee, sublessee, or mining contractor of the Cheto property involved in this suit during the years in issue. (Findings 20-28.) See CBN Corp. v. United States, 176 Ct. Cl. 861, 364 F. 2d 393 (1966), cert. denied, 386 U.S. 981 (1967); Tidewater Oil Co. v. United States, 168 Ct. Cl. 467, 466, 339 F. 2d 633, 638 (1964). Father, Filtrol was a purchaser of clay from the lessees, McCarrell and Gurley, on an exclusive sale, cost-plus-fee basis; and Filtrol’s payments to the lessees were the price paid for the clay and did not constitute an investment in the clay mineral in place. (Finding 21.) Cf. Coleman v. United States, 181 Ct. Cl. 982, 388 F. 2d 337 (1967); CBN Corp., supra.
(b) The 1949 lease between McCarrell and Gurley, and Santa Fe, was not contingent upon Filtrol’s making any investment in the mineral in place or in processing facilities. Cf. Food Mach. & Chem. Corp. v. United States, 172 Ct. Cl. 313, 348 F. 2d 921 (1966). Though Filtrol participated in the negotiations leading up to the 1949 lease, the evidence does not support the inference that Filtrol was an indispensable or silent party to the lease. In fact, Filtrol expressly refused to become a lessee or sublessee. Santa Fe was willing to lease property directly to McCarrell and Gurley, had done so since 1939, and continues to do so. There is no evidence that in 1948, Santa Fe would have preferred to lease to Filtrol. Santa Fe’s interest was simply in assuring itself that (i) the lessees would be able to meet the tonnage requirements under the lease, and (ii) Santa Fe would be able to get freight revenues from transporting mined clay. Filtrol’s exclusive purchase agreements with the lessees satisfied Santa Fe in these regards. (Finding 20.) Cf. Food Machinery, supra.
(c) Filtrol’s participation in directing and overseeing the mining operations (including financing the building of a *38 road and loading ramp, and furnishing technical assistance through geologists and engineers) did not constitute an investment in the Cheto clay in place, but rather was incident only to Filtrol’s desire to minimize mining costs and ensure the quality and quantity of mined clay. (Findings 21, 24.) Cf. Parsons v. Smith, 359 U.S. 215 (1959).
(d) Filtrol’s expenditures relating to research and development of Cheto clay did not constitute an investment in the mineral in place, but rather constituted expenditures for product and customer development. (Finding 31.) Filtrol did not build its Vernon, California plant (or any other plant) as incident to, or in anticipation of, the lease agreement of 1949. Filtrol did not build the Vernon plant (or any other plant) expressly and solely to process Cheto clay, nor were any of Filtrol’s plants dependent for operations solely on Cheto clay and the Cheto mine. (Findings 16, 27.) Cf. Food Machinery, supra; Scofield v. La Gloria Oil & Gas Co., 268 F.2d 699 (5th Cir. 1959), cert. denied, 361 U.S. 933 (1960).
In short, Filtrol did not acquire by investment an interest in the Cheto clay mineral in place. Filtrol, through its contractual relationship with the lessees of the Cheto property, possessed a mere economic or pecuniary advantage in the mining and production of Cheto clay. Accordingly, Filtrol had no economic interest in the Cheto mine during the years in issue and is not entitled to percentage depletion deductions for the years 1953-57.
The result here reached is fully consistent with the Ninth Circuit’s decision in Grimes v. United States, 295 F. 2d 623 (1961). That case held that for the year 1953, McCarrell and Gurley, as owners in fee of part of the Cheto property and lessees of Santa Fe for another part, had an “economic interest” in the Cheto mine with respect to clay mined and sold to Filtrol. To hold here that Filtrol had the same “economic interest” would permit, in effect, a multiple depletion allowance for the same property (at least for the year 1953); would be contrary to the facts here established; and would be inconsistent with the Grimes decision. Plaintiff has *39 made no persuasive showing that it should prevail or that Grimes was decided incorrectly.*
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Judge James F. Davis, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff, Filtrol Corporation, is a Delaware corporation having its principal office in Vernon, Los Angeles County, California. Filtrol maintains its books of account on the accrual method for a calendar year accounting period, and its tax returns are prepared and filed accordingly.
2. The tax involved in this case is corporate income tax paid by Filtrol for calendar years 1953 through 1957. Filtrol filed corporate income tax returns with the District Director of Internal Eevenue, Los Angeles, California, on or about the following dates:
Date filed Taxable year
..7-15-54 1983..
,.6-10-55 1984..
,.6-13-66 1955..
6-14-67 1966..
.6-15-58 1957..
Extensions of time for filing the returns were obtained from the Office of the District Director, and the returns were timely filed during such extensions.
3.With respect to calendar years 1953 and 1954, Filtrol and the Commissioner of Internal Eevenue (hereinafter Commissioner) extended, by appropriate written agreement, the respective periods of limitation on assessment to June 30, 1958 and June 30,1959, respectively.
*40 4.The amounts of tax reported and timely paid by Filtrol for the years in issue, and the dates of payment, are as follows:
Date of Amount of Total on Taxable year payment payment tax return
1963. 3-16-54 $720,000.00
6-15-54 324,000.00
9-16-54 38,580.05
12-1^-54 56,977.90
-$1,139,557.96
1954. 3-15-55 $850,000.00
6-13-55 361,102.74
-$1,211,102.74
1965. (*) *$111,286.00
3-15-56 1,160,636.28
6-13-56 734.03
7-06-56 1,159,902.25
-$2,432,558.56
**$293,000.00 1956. **9-17-56
**293,000.00 **12-17-56
1,064,350.00 3-15-57
800,000.00 6-16-57
280,367.00 6-15-57
- $2,730,717.00
1957__. **9-16-57 **$315,000.00
**12-16-57 **315,000.00
3-17-58 636,000.00
8-08-58 636,282.00
-$1,902,282.00
In addition, with the repeal of section 452 of the Internal Revenue Code of 1954, Filtrol reported, on form 2175, and paid, on or before December 12, 1955, additional tax of $65,520 for the year 1954. Such form 2175 was timely filed and such payment of $65,520 was timely made.
5. In computing its income tax liability for calendar years 1953 through 1957, Filtrol claimed deductions for percentage depletion with respect to the bentonite clay mined and delivered to Filtrol from the Cheto mine. Filtrol did not reduce its claimed depletable income, with respect to clay from the Cheto mine and other mines, to reflect the costs of the containers in which a substantia] portion of its processed clay was sold.
6. The Commissioner, upon audit of Filtrol’s income tax *41 returns, determined deficiencies against Filtrol in the following respective amounts:

Year Amount

1953 $25,810.20
1954 139,272.98
1955 50,278.35
1956 30,332.37
1957 24,890.41
These tax deficiencies were paid by Filtrol on or about the following respective dates:

Year Date

1953 2-10-58
1954 1-21-59
1955 1-21-59
1956 1-21-59
1957 3-20-59
7. In determining the deficiencies noted in finding 6, the Commissioner found that payments made by Filtrol to the lessees of the Cheto mine (treated by Filtrol as mining costs) were, in fact, the payment of “royalties,” and that such payments should be excluded in determining depletable gross income, i.e., gross income from mining. Such determination by the Commissioner was premised upon the assumption that Filtrol had an economic interest in the Cheto mine and the clay extracted therefrom. Accordingly, Filtrol was allowed depletion deductions for the Cheto property for the years in issue but in a lesser amount than originally asserted by Filtrol.
8. Filtrol filed timely claims for refund for each of the years in issue, challenging the Commissioner’s partial dis-allowance of the depletion deductions claimed on its returns. The claims for refunds were made on the following dates for the following amounts:
Year Date Amount
1963 (original).. 6-27-68 $19,864.20
1963 (amended). 2-27-69 36,912.24
1964. 6-26-69 93,027.00
1966 (original). 3-13-69 72,512.59
1955 (amended)._..... 3-1460 72,512.69
1966. 3-14-60 88,057.32
1957. 3-15-81 96,549.09
*42 9.By certified letters dated August 12, 1963, Filtrol received notice of disallowance in full of its claims for refund as follows:
Year Amount
1953. $35,912.24
1954. 93,027.00
1955. 72,612.59
1956. 88,057.32
1957. 95,649.00
10. By timely petition filed in this court on September 4, 1964, Filtrol put in issue the partial disallowance of its depletion deductions at the Cheto mine by reason of the treatment of certain of its claimed mining costs as “royalties.” The petition also put in issue the reduction of Filtrol’s depletable gross income by an amount representing the cost of containers in which a substantial portion of Filtrol’s processed clay was sold. Filtrol subsequently conceded the latter issue and makes no further claim therefor.
11. (a) On January 4, 1965, the Government filed its answer. At no place therein did the Government assert that Filtrol had no economic interest in the Cheto mine or the clay extracted therefrom; nor did the Government assert that Filtrol had no depletable gross income from the Cheto mine.
(b) On August 30, 1965, the Government filed its first amended answer, alleging that Filtrol did not have an economic interest in the Cheto mine or in the clay extracted therefrom and that Filtrol had no depletable gross income from Cheto mine. The first amended answer also alleged that certain of the processes applied by Filtrol in obtaining the processed clay products it sold should be excluded in computing its depletable gross income from the properties concerned.
12. Filtrol is and always has been the sole and absolute owner of the claims asserted in this litigation. It has made no transfer or assignment of these claims, or any part thereof, or any interest therein.
13. During the period 1953 through 1957, Filtrol engaged in the business of mining and processing bentonite and hal- *43 loysite clays. Filtrol operated three plants, located at Vernon (Los Angeles), California; Jackson, Mississippi; and Salt Lake City, Utah. Generally, bentonite clay was processed at the Vernon and Jackson plants; and halloysite clay was processed at the Salt Lake City plant.
16. (a) Filtrol originally obtained its clay from a deposit in Death Valley, California. From about 1923 to the late 1930’s or early 1940’s, Filtrol’s principal source of supply was the Chambers deposit of bentonite clay in Apache County, Arizona, which Filtrol owned in fee. Filtrol also owned an interest in and mined the Allentown deposit of bentonite clay in Apache County, Arizona, though the Allentown deposit was mined only intermittently, for testing purposes.
(b) Prior to 1932, mining operations at the Chambers mine were handled by Filtrol employees. In 1932, Filtrol entered into a contract with a former employee to conduct mining operations as an independent contractor. From 1932 to the late 1930’s, the mining contractors were Mullen and McCar-rell. Similarly, the Allentown deposit was mined, first, by Filtrol employees and then, commencing in 1932, by an independent contractor.
(c) The evidence supports the inference that, beginning in 1932, Filtrol employed independent contractors to conduct its mining operations in Arizona because (i) Filtrol believed it would be less expensive to do so since mining was intermittent during the depression years, and (ii) the State of Arizona had asserted a tax claim against Filtrol, based on the value of Filtrol’s processed clay rather than on the value of the clay as it left Arizona. To avoid this Arizona tax, Filtrol decided that it should not, itself, mine in Arizona but rather should employ independent contractors.
17. While operating the Chambers mine, Filtrol regularly employed in the Chambers-Sanders area a staff of geologists and mining engineers doing prospecting and exploration work. Such prospecting and exploration work resulted in the discovery, in the late 1930’s, of several deposits of bentonite clay in the Chambers-Sanders area. The deposits were on lands owned by the Santa Fe Pacific Kailroad Company (hereinafter Santa Fe), the State of Arizona and others. The *44 deposits were at the site of wbat is now called the Cheto mine, which encompasses 10-plus sections of land in Township 21N, Kange 29E, Apache County, Arizona, centered about 5 miles south of Sanders. Following discovery of the Cheto clay deposits, Filtrol’s mining department drilled out the deposits on 110-foot centers. The Cheto clay samples so obtained were tested by Filtrol to determine possible product applications. Throughout later years and as the Cheto deposit was developed, Filtrol’s engineers returned to areas having clay potentially usable to Filtrol and conducted close drilling on 55-foot centers to obtain samples for further testing.
18. (a) In the late 1930’s, McCarrell, one of Filtrol’s mining contractors on the Chambers mine, obtained a lease from the State of Arizona to lands at the Cheto deposit and transferred his mining operations from the Chambers mine to the Cheto deposit. Mullen, McCarrell’s mining partner, died at about that time.
(b) Subsequently, in 1939, McCarrell and two others (Crawford and Gurley) obtained a lease from Santa Fe (renewable after 5 years) on 900 acres at the Cheto deposit to search for and mine bentonite. Gurley was McCarrell’s new partner in the mining operations.
(c) In 1944, McCarrell and Gurley obtained a lease from Santa Fe on additional acres at the Cheto deposit to search for and mine bentonite. This lease also was subject to renewal after a term of 5 years.
19. By a memorandum of agreement dated June 30,1941, and an agreement dated November 3, 1944, McCarrell and Gurley agreed to conduct mining operations at the Cheto deposit, and Filtrol agreed, in essence, to purchase the mined clay and to compensate McCarrell and Gurley on the basis of the actual costs of mining plus a per-ton fee for clay mined. Included in the payment was a 10-cents-per-ton royalty to be paid to Santa Fe, the lessor.
20. (a) On September 11, 1948 (to be effective December 31, 1949), earlier agreements between McCarrell and Gurley, and Filtrol, were terminated due to Gurley’s desire to withdraw from mining operations. McCarrell and Gurley requested a new arrangement under which Gurley would not be responsible for mining operations. McCarrell and Gurley suggested a sublease of the Cheto mine premises to Filtrol *45 under which (i) “royalties” would be paid to McCarrell and Gurley and (ii) a separate mining contracting agreement would be entered into between Filtrol, as sublessee, and McCarrell, as independent mining contractor, to which Gurley would not be a party.
(b) McCarrell’s and Gurley’s suggestion was not accepted by Filtrol. Filtrol concluded that such a formal sublease and direct contracting arrangement would expose Filtrol to substantial local taxes in Arizona. Instead, in Subsequent negotiations with McCarrell and Gurley, Filtrol, through its house counsel John H. Saunders, worked out an alternative arrangement (described in finding 21), designed to satisfy Gurley’s desires and, at the same time, to minimize Filtrol’s exposure to Arizona taxes.
(c) On March 2,1949, McCarrell and Gurley entered into a new consolidated lease with Santa Fe, Lease No. 9368, covering 1,260 acres for the exploration and mining of ben-tonite clay at the Cheto deposit. Lease No. 9368 superseded the earlier leases of 1939 and 1944 (finding 18(b) and (c)) and had an initial term of 11 years, with an option to extend for additional 5-year periods. In the negotiation of Lease No. 9368, Filtrol communicated with Santa Fe, and Santa Fe informed Filtrol that it would not enter into the lease until it was assured that the lease met with Filtrol’s approval.
(d) Lease No. 9368, as executed, followed closely a draft prepared by John H. Saunders, Filtrol’s house counsel. Santa Fe advised Filtrol that Lea'se No. 9368 would not become effective unless Filtrol entered into its agreement with McCarrell and Gurley, which Filtrol subsequently did on June 7, 1949. (Finding 21.)
(e) Under Lease No. 9368, McCarrell and Gurley were required to mine and ship minimum tonnages of clay, or else Santa Fe had an option to terminate. Paragraph 15 of Lease No. 9368 provided:
The lessor [Santa Fe], at its option, may give notice to terminate this lease at any time the amount of material removed from said premises shall fall below an average of 1,000 tons per month in any period of six consecutive months; provided, however, that such notice of termination last described shall be of no effect and the Lessor’s option to terminate shall cease and be cancelled for such default if the total amount of material removed *46 from said premises during the six month period immediately following such notice shall be sufficient to bring the total production in any twelve consecutive months to 12,000 tons or more.
(f) Under Lease No. 9368, Santa Fe received, minimally, a 25-cents-per-acre annual rental fee or, alternatively, a royalty of 10 cents per ton on clay extracted and shipped from its lands at the Cheto mine. Santa Fe’s principal interest in the lease arrangement was the immense volume of clay to be shipped on the Santa Fe system from the Cheto mine to Filtrol’s plant at Vernon, California, and in the corresponding backhaul volumes.
(g) Though Filtrol participated in the negotiations leading up to Lease No. 9368, the evidence does not support the inference that Filtrol was an indispensable or silent party to the lease. In fact, Filtrol expressly refused to become a lessee or sublessee. Santa Fe was willing to lease property directly to McCarrell and Gurley, had done so since 1939, and continues to do so. There is no evidence that in 1948, Santa Fe would have preferred to lease to Filtrol. Santa Fe’s interest was simply in assuring itself that (i) the lessees would be able to meet the tonnage requirements under the lease, and (ii) Santa Fe would be able to get freight revenues from transporting mined clay. Filtrol’s exclusive purchase agreements with the lessees satisfied Santa Fe in these regards.
21. (a) On June 7,1949, McCarrell and Gurley, as lessees, entered into an agreement (hereinafter called Agreement I) with McCarrell, individually, for the mining of the properties covered by Lease No. 9368. Under the agreement, McCarrell was to receive as compensation an amount equal to the expenses of operation, plus $5,400 per annum. The agreement was for a term of 5 years, commencing January 1, 1950.
(b) On the same day, June 7,1949, McCarrell and Gurley, as lessees, entered into an agreement (hereinafter called Agreement II) with Filtrol, by which Filtrol, exclusively, would be supplied with clay mined from the property covered by Lease No. 9368. Agreement II acknowledged and incorporated Agreement I. Agreement II provided that Filtrol would have the right to approve the appointment of a mining contractor to replace McCarrell if he (McCarrell) did not *47 comply with the agreement terms. Filtrol obtained the right to designate and lay out mining pits and the removal of overburden, and to purchase a maximum amount of bentonite, not exceeding the amount that the contractors could produce but not less than an amount which the lessees were required to mine under Lease No. 9368. Filtrol agreed to pay to the lessees for the clay, f.o.b. railroad cars, Cheto, Arizona, an amount which would cover the following items:
1. [Royalties and other payments due under Lease No. 9368, including certain taxes which would be incurred in operating the leasehold.
2. Mining costs payable to the mining contractor.
3. A profit of 300 per ton up to 100,000 tons and 200 per ton over 100,000 tons.
Filtrol agreed to pay McCarrell and Gurley the above amounts as billed monthly. Agreement II was for a term ending on December 31, 1959, unless terminated sooner, as provided in the agreement. Filtrol could terminate Agreement II at its option by notice to McCarrell and Gurley, plus the payment of $12,000, in which case Filtrol would be entitled to the delivery of not more than 40,000 tons during the next 12 months without payment of the 30 cents/20 cents profit which was otherwise payable. McCarrell and Gurley could terminate Agreement II on Filtrol’s default under its terms. Filtrol was given the right to enter and operate the property on specified default by McCarrell and Gurley. Agreement II provided that McCarrell and Gurley were not agents, representatives, employees, or servants of Filtrol.
(c) The bifurcation of agreements into Agreements I and II, in 1949, occurred because Gurley did not want to continue to be liable for any part of the actual mining operations, but he did want to remain a lessee.
22. After execution of the June 7, 1949 agreements (Agreements I and II), Filtrol geologists and mining engineers continued to participate in exploration and development of bentonite clay reserves in the Cheto mine area. An extension of the clay deposit was discovered on nearby lands owned by Santa Fe but not covered by Lease No. 9368. In 1952, McCarrell and Gurley leased an additional 360 acres from Santa Fe under a modified lease designated Lease No. *48 9398, bringing the total acreage under lease to 1,620 acres. Shortly thereafter in 1952, a supplemental agreement (to Agreement I) was entered into between McCarrell and Cur-ley, as lessees, and McCarrell, as operator; and a supplemental agreement (to Agreement H) was entered into between McCarrell and Gurley, as lessees, and Filtrol. The supplemental agreements extended the terms of the 1949 Agreements I and II to the property covered by the 1952 Lease No. 9398 (except for 160 acres) and to 60 acres owned in fee by McCarrell and Gurley. Also, 40 acres previously included under Agreements I and II were released by the supplemental agreements. Thus, as of 1952, Filtrol had the exclusive right to be supplied with the clay mined from 1,420 acres of land under lease from Santa Fe to McCarrell and Gurley, and from 60 acres owned in fee by McCarrell and Gurley. As to the balance of the Cheto acreage under lease to McCarrell and Gurley (200 acres), they (McCarrell and Gurley) were free to mine and dispose of the clay as they saw fit.
23. In 1953, McCarrell and Gurley obtained from Santa Fe another modification to Lease No. 9368 (called Lease No. 9368C), adding 600 adjacent acres to the leasehold. There is no evidence that Agreements I and II were modified to embrace lands under the new lease, or that Filtrol obtained clay therefrom.
24. (a) Mining clay at the Cheto deposit required the removal of overburden, which was 80-to-100 feet thick, in order to reach the clay bed. The clay bed was about 4 feet thick, on the average. Overburden removal required the use of heavier equipment than the actual mining. Equipment and labor for overburden removal was obtained by McCarrell from a partnership of McCarrell and another individual, Gordon K. Grimes. Filtrol paid for overburden removal on a monthly basis as it occurred, in the same manner that it paid for other mining costs which were billed to it through the lessees, McCarrell and Gurley. Overburden removal was done under mining plans prepared by Filtrol engineers to the extent of Filtrol’s willingness to pay for it. After McCarrell removed the overburden, he mined the clay, as Filtrol designated its needs. Filtrol determined the pits to be mined, *49 the overburden removal policies, the rate of clay removal, and the quantity and quality of clay removed.
(b) McCarrell, at Filtrol’s expense, built a road over which the Cheto clay was trucked from the Cheto mine to the railroad for shipment to Filtrol’s plants. Filtrol also designed and built, at its expense, a new loading ramp to accommodate the large volumes of clay shipped from the Cheto mine. There is no evidence of the actual dollar expense so incurred by Filtrol, and it is reasonable to infer that the expense was not great.
(c) Filtrol negotiated with Santa Fe for an extension of the railroad siding used in loading clay for shipment from the Cheto mine. The railroad siding had to be extended to accommodate the large number of railroad cars used. Santa Fe agreed to and did extend the railroad siding because of the large volumes of clay shipped over the Santa Fe system and because Filtrol agreed to backhaul on the Santa Fe line.
(d) During the period that McCarrell alone acted as miriing contractor, McCarrell and Gurley were reimbursed by Filtrol for all expenditures for exploration and development of the Cheto deposit. There is no evidence of the actual dollar amount of such expenditures.
(e) Filtrol employed its own inspectors at the Cheto mine to ensure that McCarrell (i) was following Filtrol’s instructions as to the areas to be exploited and (ii) was utilizing the most efficient overburden removal and clay-extraction methods. There is no evidence of the actual dollar expenditures for such activities.
25. By 1954, trouble developed between Filtrol and McCarrell. Filtrol was dissatisfied with McCarrell because he was not operating the Cheto mine as efficiently as Filtrol wanted. In addition, McCarrell and Filtrol disagreed about the extent to which overburden should be stripped in advance; McCarrell began to demand payments in advance (whereas previously Filtrol had paid McCarrell after he billed Filtrol for his expenses); and McCarrell opposed Fil-trol’s plan to purchase a large dragline to remove overburden.
McCarrell’s mining contract terminated on December 31, 1954, and a dispute arose between Filtrol, McCarrell and *50 Gurley as to w'bo was to be the mining contractor at the Cheto mine after December 31, 1954. Filtrol designated its wholly-owned subsidiary, Alba Mining Corporation (hereinafter Alba), as operator (commencing January 1, 1955), of part of the properties theretofore mined by McCarrell. McCarrell resisted, however, and the dispute continued for several years. Alba conducted mining operations from 1955 to about mid-1959. McCarrell and Gurley attempted to terminate Alba as mining contractor and nominated J. A. McDonald to replace Alba, effective October 1,1958; but Filtrol rejected McDonald’s nomination and again selected Alba as mining contractor.
26. In June 1958, Filtrol notified McCarrell and Gurley that it chose to terminate Agreement II; and, in accordance with the terms of that agreement, Filtrol enclosed a check for $12,000. The termination was to be effective on July 2, 1959, or when 40,000 tons of clay had been delivered, whichever occurred fust. After Filtrol terminated Agreement II, it obtained its requirements of Cheto clay from stockpiles previously built up under Alba’s operations.
27. McCarrell and Gurley continued to hold the leases to the Cheto property after notice of termination of Agreement II. In 1959, Filtrol wrote to Santa Fe, informing it that if the railroad wanted further freight business from the mine, it must terminate the leases with McCarrell and Gurley, and grant leases to Filtrol. Otherwise, Filtrol would resume mining at the Chambers mine and would ship its clay on another railroad.
28. Santa Fe did not immediately terminate the leases to McCarrell and Gurley. However, because McCarrell and Gurley were unable to meet minimum production under the leases, the leases wei’e ultimately terminated by Santa Fe, and litigation ensued between McCarrell and Gurley, and Santa Fe. A compromise was worked out (in October 1960), under which Santa Fe extended the leases (on at least 2,200 acres), and Filtrol obtained a sublease from McCarrell and Gurley on 1,360 acres of the land covered by the 1949 lease (No. 9368), as supplemented. In 1963 and 1964, Filtrol obtained leases directly from Santa Fe to some Cheto acreage.
*51 29. At the time of trial, McCarrell’s estate (he had died) and Gurley continued to hold leases in part of the Cheto deposit from Santa Fe and the State of Arizona, and to hold a parcel in fee. During the years in issue, Cheto ben-tonite was mined and sold to third parties 'by McCarrell and Gurley from the properties held by them which were not subject to Agreement II with Filtrol. The amount of clay so-sold was as follows:
Clay material Year sold — weight in tons
1953. 3487
1954. 4714
1956. 5066
1966-5560
1957. 5138
There is no evidence to show that the bentonite mined and sold by McCarrell and Gurley to third parties was significantly different in quality or composition from Cheto ben-tonite obtained and used by Filtrol to make its products. At present, the McCarrell and Gurley properties at the Cheto deposit share a common corner with Filtrol lands in checkerboard fashion, and the separate mining operations are sometimes conducted in close proximity to one another.
31. During the period 1937 through 1953, Filtrol spent $1,262,500 for research and development relating to processing and selling Cheto clay, as follows: $289,300 for developing particular customer products; $826,800 for developing methods of processing Cheto clay to make commercial products; $36,500 for analyzing clay samples from the Cheto clay deposit; and $109,900 for studying the effects on Cheto clay of acid treatment. It is not clear from the record how much money Filtrol spent on comparable research and development with respect to other clays which it processed or to what extent the above-noted expenditures generated information and data useful to product development of calcium bentonite clays in general. It is reasonable to infer, however, that the major expenditures related to acid treatment, a process not directly related to mining but rather to manu *52 facturing, and that such expenditures were useful in developing halloysite catalysts as well as bentonite catalysts.
CONCLUSION OP LAW
Upon the foregoing findings of fact and opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and plaintiff’s petition is dismissed.

 Filtrol appeared In the Grimes litigation as amicus curiae and argued that It, rather than McCarrell and Gurley, was the lessee of the Cheto property. The Government supported that argument, In Its attempt to deny McCarrell a depletion deduction, but the court expressly refused to consider It. See Grimes, supra, n. 2.

 Estimated tax paid in equal installments of $55,643 each on September 12, 1955 and November 30, 1956.

 Estimated tax.