**THORNBERRY CONSTRUCTION COMPANY, INC.**

v.

**The UNITED STATES.**

No. 271-75.

United States Court of Claims.

May 17, 1978.

Charles F. Wood, Louisville, Ky., attorney of record, for plaintiff. Wood, Goldberg, Pedley & Stansbury, Louisville, Ky., of counsel.

James L. Malone, III, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and MILLER *, Judges.

## OPINION

### PER CURIAM.

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Harry E. Wood, filed April 7, 1977, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case **. Accordingly, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount thereof to be determined in further proceedings pursuant to Rule 131(c).

---

\* The dissenting opinion of Judge Miller, Associate Judge, U.S. Court of Customs and Patent Appeals, sitting by designation, follows the opinion of the trial judge which has been adopted by the court.

## OPINION OF TRIAL JUDGE

WOOD, Trial Judge: In this action, plaintiff, a corporation engaged during its fiscal year ended March 31, 1974, in the business of strip mining coal in western Kentucky, sues to recover $90,705 in federal income taxes, plus deficiency interest of $5,666 thereon, paid in consequence of the Internal Revenue Service's denial of a deduction for depletion claimed by plaintiff on its federal income tax return for the said fiscal year.

The issue is whether plaintiff possessed "an economic interest" in certain coal in place under a February 14, 1973 agreement styled "Coal Mining Lease and Sublease" between American Metal Climax, Inc. (AMAX) and James R. Thornberry, and a March 1, 1973 assignment from James R. Thornberry to plaintiff. If, as plaintiff contends, it had such an interest, it was entitled to a proper deduction for depletion, while if defendant's contrary argument is valid, the petition should be dismissed. For reasons hereinafter set forth, it is concluded that plaintiff is entitled to recover.

### I

From 1963 to 1972, James M. Thornberry (plaintiff's sole stockholder during the tax year in suit), worked as general manager of Thornberry Construction Company, an unincorporated business owned by his father, James R. Thornberry. During that period, Thornberry Construction Company engaged in, among other things, the construction of haul roads from mines, mine sites, roads and dams, and, during the period 1970–72, in mining operations in southern Indiana. Thornberry Construction Company's clients included AMAX, and AMAX's upper management level personnel thus came to know both James R. Thornberry and James M. Thornberry. In early 1973, James M. Thornberry purchased all of the stock of

---

\*\* Whereas the court adopts the trial judge's separate findings of fact which are set forth in his report filed April 7, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

Thornberry Construction Company, Inc., from his father, and became (and was throughout the fiscal year ended March 31, 1974) plaintiff's president and operating manager.

Sometime prior to 1973, James R. Thornberry had informed AMAX that if it ever had a block of coal extraneous to its mining operations, he would be interested in leasing the block of coal and operating a mine. On February 14, 1973, AMAX and Mr. Thornberry entered into the "Coal Mining Lease and Sublease" (sometimes hereinafter "the lease") at the center of this litigation, and shortly thereafter Mr. Thornberry made an assignment of the lease to plaintiff. At least in defendant's view, however, the lease and the assignment must be viewed in the light of precedent facts and circumstances, described hereinafter.

Coal in western Kentucky lies under the surface in beds or seams that are described by numbers. Each seam has distinct British Thermal Unit (BTU) and other quality characteristics. No. 12 coal, a low quality, thick seam coal, overlies no. 11 coal, a medium quality, thick seam coal. While these two seams are usually separated by several feet of limestone, they are always mined together. No. 12 coal normally has a BTU rating of 10,800 to 11,000, while no. 11 coal normally has a BTU rating of about 11,000. No. 9 coal, a substantially better coal with lower ash content, has an average BTU rating of 11,300 to 11,400.

During the fall of 1969, Ayrshire Coal Company (which in October 1969 merged into and became a division of AMAX) began mining no. 12 and no. 11 coals at the Ayrgem Mine, Muhlenberg County, Kentucky. Most of the coals mined at the Ayrgem Mine were sold to the Tennessee Valley Authority for delivery to the Paradise Steam Plant, a TVA facility some 10 miles from the Ayrgem Mine. From almost the inception of mining operations at the Ayrgem Mine, AMAX experienced only marginal profitability from such operations because of a low profit realization on its TVA contract. In order to increase the profitability of its Ayrgem mining operations, AMAX sought to, and, commencing in 1970, did, sell a portion of its Ayrgem coals to Mr. Thomas W. Talbert, an independent coal broker.

Mr. Talbert had an agreement with Dairyland Power Cooperative ("Dairyland"), LaCrosse, Wisconsin, to purchase coal for it each year in and after 1969, and, in effect, resold to Dairyland the Ayrgem coals he purchased from AMAX. While the Talbert-Dairyland agreement did not contain any specific BTU guarantee or requirement, at least some of AMAX's agreements with Mr. Talbert did contain a BTU rating guarantee (10,500 in 1970, and 10,000 in 1971). In 1971, and in each of the years thereafter through 1974, Mr. Talbert purchased from AMAX 400,000 tons of Ayrgem coals.

For 1973, Mr. Talbert was attempting to furnish to Dairyland coal having an average BTU rating of 10,500. By that time, however, the no. 12 and no. 11 coals produced at the Ayrgem Mine had deteriorated in quality to the point where the Ayrgem blend, with an average BTU rating of only 9,500, was about to reach a noncompetitive position with other coals available on a BTU basis. AMAX realized that, if it were to continue to sell the Ayrgem blend to Mr. Talbert, an upgrading in quality was necessary. The only way the Ayrgem blend could be upgraded was to blend it with a better quality coal.

For several years prior to 1973, AMAX had owned a seam of no. 9 coal, amounting to more than 2,000,000 tons, adjacent to its Ayrgem Mine. For a number of reasons (including the undesirability of putting a small satellite operation around the Ayrgem Mine, the confusion and labor problems such an operation would cause, a lack of proper equipment with which to strip the no. 9 coal reserve, and a lack of management to supervise the operation), AMAX had determined that it was not economically feasible or practical for it to mine this seam of no. 9 coal itself, and that determination was, as of 1973, still a valid one from AMAX's standpoint.

In early 1973, AMAX was well aware of Mr. Talbert's problems with AMAX's Ayrgem coals. It knew, too, that unless it took steps designed to result in an upgrading of those coals, Mr. Talbert probably would not accept them in the future because of their inferior BTU quality, and that its own no. 9 coal reserve adjacent to the Ayrgem Mine was the only known available source of high quality coal that could be economically blended with the Ayrgem coals being sold to Mr. Talbert. Since mining the no. 9 coal was, for AMAX, neither economically feasible nor otherwise practical, however, leasing the no. 9 coal to a lessee who would mine it and sell it to Mr. Talbert (and pay AMAX a royalty) made excellent sense from AMAX's standpoint, since it would permit depletion of the no. 9 coal, allow AMAX to enhance its profit position at the Ayrgem Mine, and also result in AMAX's receipt of a profit from the mining of the no. 9 coal.

In late January or early February 1973, Mr. Hopper, president of AMAX Coal Company, advised James R. Thornberry, in substance, that AMAX was interested in leasing its no. 9 coal to someone who would mine it and sell to Mr. Talbert a sufficient amount thereof to blend with Ayrgem coals to upgrade the latter. Mr. Thornberry indicated he would be interested in entering into such a transaction. Mr. Hopper told Mr. Thornberry he was sure Mr. Thornberry would be able to sell coal to Mr. Talbert on the basis of a fair deal, and that if Mr. Thornberry could "work out something" with Mr. Talbert, AMAX would lease the no. 9 coal to Mr. Thornberry.

At Mr. Hopper's invitation, James R. Thornberry and James M. Thornberry then went to AMAX's office in Indianapolis, Indiana, where they were introduced to, and met separately with, Mr. Talbert. After discussion of Mr. Talbert's no. 9 coal requirements for a 2-year period (some 800,000 tons), and with access to the results of geological surveys of AMAX's no. 9 coal

reserve conducted by AMAX prior to January 1973, James M. Thornberry concluded that plaintiff could profitably operate a mine based on what Mr. Talbert indicated he was willing to pay for no. 9 coal at that time.

Prior to February 14, 1973, James M. Thornberry and Mr. Talbert entered into an oral agreement for the sale by plaintiff to Mr. Talbert of approximately 400,000 tons of no. 9 coal per year, for 2 years, at a stated, mutually agreeable, price per ton. The oral agreement included a "cost escalation" provision, but, because coal prices were then relatively stable, possible price increases due to changes in market conditions were neither anticipated nor discussed.[1] AMAX took no part in the negotiations between James M. Thornberry and Mr. Talbert, nor was it even aware of the terms and conditions of the oral agreement between them. In particular, AMAX played no part whatever in the determination of the per ton price Mr. Talbert would pay to plaintiff for coal mined and sold to Mr. Talbert. Thereafter, James R. Thornberry and James M. Thornberry advised Mr. Hopper that they had reached an agreement with Mr. Talbert, and that they would like to lease AMAX's no. 9 coal reserve.

On February 14, 1973, AMAX and James R. Thornberry entered into a "Coal Mining Lease and Sublease" providing, in substance, that AMAX, for a stated consideration, "does hereby lease, sublease and let unto" Mr. Thornberry "all of the Kentucky # 9 Vein or Seam of coal * * * underlying * * *" 384.4 acres (less 2 acres commonly known as the Wilcox Cemetery) in Muhlenberg County, Kentucky, granting during the term of the lease "all of the mining rights and privileges owned * * appurtenant to said premises, and * * * the right to enter onto, under, over, across and through the Kentucky # 9 Coal and the surface and subsurface overlying the same at such points and in such manner as may be necessary or convenient for the

---

1. Mr. Talbert did, however, agree to two increases in price, unrelated to increased costs, in 1974: a $1.00 per ton market increase in August, and a $3.50 per ton market increase in November.

purpose of mining all of the Kentucky # 9 Vein of coal hereby leased  *  *  *."

The lease was for a term ending February 28, 1975, and provided that AMAX would be paid a royalty of 75¢ per ton for each ton of no. 9 coal mined, removed, and sold from the leased premises. It contained a "Diligent Operation" clause, provided that mining operations should be performed so as not to interfere with AMAX's operation of the Ayrgem Mine, and required the lessee to perform reclamation work under the agreement in a manner consistent with such work at the Ayrgem Mine.

Clause (6),[2] the principal if not the sole basis for defendant's insistence that the lease was "nothing more than a contract to mine coal", provided in pertinent part as follows:

(6) *Sale of Coal to Tom Talbert.* It is expressly agreed by the Lessor and the Lessee that all Kentucky # 9 Coal from the leased premises shall be sold to Tom Talbert. In the event that the coal, for any reason, is not sold to Tom Talbert, then and in such event, the Lessor shall have the option to terminate this Lease without further obligation or liability on the part of either party to the other party hereto  *  *  *.

From AMAX's standpoint, the basic intent of the lease was to make a sufficient amount of no. 9 coal available to Mr. Talbert, and, had James M. Thornberry not reached an agreement with Mr. Talbert, it is doubtful that AMAX would have leased the no. 9 coal to James R. Thornberry. The record is clear, however, that AMAX had no objection whatever to plaintiff's sale of no. 9 coal to others, provided Mr. Talbert did not need it. The record is equally clear that both the oral agreement with Mr. Talbert and the lease were bona fide, arm's-length transactions, and that the results of the said agreements were to the benefit of all concerned.

On March 1, 1973, James R. Thornberry assigned to plaintiff all of his right, title and interest in and to the lease "until such time as the Assignee has removed 800,000 tons of coal from the property." Plaintiff agreed, among other things, to make royalty payments to AMAX as prescribed in clause (3), and to sell coal to Mr. Talbert as prescribed in clause (6), of the lease.

Following March 1, 1973, plaintiff began a mining operation on the leased property. It retained an engineering firm to perform certain work required in connection with obtaining a strip mining permit in Kentucky and laying out a mining operation. It bought approximately $900,000 worth of equipment with which to begin strip mining operations. It constructed a haul road and a stockpile area for use in removing coal from the mining area and stockpiling it. It relocated the entrance road to the Wilcox Cemetery (surrounded by no. 9 coal reserve), and also relocated a county road running through the leased property, in order that all of the minable coal on the said property might be removed. It also obtained and paid for a reclamation bond, and secured a strip mining permit.

Plaintiff's mining development engineering costs, the costs of construction of the haul road and stockpile area, and the cost of relocation of the cemetery entrance road were deducted by plaintiff as current business expenses. Plaintiff's costs of acquisition of equipment, and its costs for relocation of the county road, were capitalized on its books, and for federal income tax purposes were subject to depreciation deductions in plaintiff's fiscal year ended March 31, 1974.

During its fiscal year ended March 31, 1974, plaintiff mined, and hauled to its stockpile, approximately 442,000 tons of no. 9 coal. Mr. Talbert's trucks picked up the coal there and it was transported to the Rochester Dock where the net weight of the coal was determined and weigh tickets were prepared. Plaintiff's invoices reflect that, during the said fiscal year, it sold to Mr. Talbert some 442,000 tons of coal, and Mr.

**2.** Clause (6) was inserted in the February 14, 1973 agreement by AMAX. The basis therefor was to emphasize that AMAX's principal reason for the transaction was to provide no. 9 coal to Mr. Talbert, in order to enhance AMAX's profit position at the Ayrgem Mine.

Talbert paid plaintiff the amount shown to be due it on the said invoices.[3] AMAX, which received a copy of each weigh ticket, billed plaintiff for the 75¢ per ton royalty due it under the terms of the lease and assignment, and plaintiff paid AMAX the amounts shown to be due it on AMAX's billings.

On March 1, 1974, and effective April 1, 1974, AMAX and plaintiff executed an amendment to the lease adding additional acreage to that described in the lease, and increasing AMAX's royalty to $1.25 per ton. Following (and as a result of) that addition, plaintiff acquired by purchase, at a cost of $110,000, surface rights in certain reserves of no. 9 coal.[4] Neither plaintiff nor James R. Thornberry owned any surface rights in any of the property described in the lease prior to March 31, 1974, however:

## II

In the case of mines and other natural deposits, Section 611(a) of the Internal Revenue Code of 1954 provides for the deduction of "a reasonable allowance for depletion * * * according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * * " A depletion allowance of 10 percent of "the gross income from the property",[5] excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property, is authorized in the case of coal, provided that such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). Sections 613(a), 613(b)(4).

Pursuant to Section 611(a), the Treasury Department has duly prescribed regulations under which "a reasonable allowance for

depletion * * * shall be allowed * * * ."[6] Treasury Regulation § 1.611–1(b)(1) (1970) provides in part as follows:

(b) ECONOMIC INTEREST. (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits * * *. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place * * * and secures, by any form of legal relationship, income derived from the extraction of the mineral * * * to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit * * * does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another * * * entitling the latter to compensation for·extraction * * * does not convey a depletable economic interest. * * *

The concept of an "economic interest" was first enunciated in *Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). There, in dealing with a predecessor of Section 611(a), the Supreme Court held that "The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." *Id.*, 287 U.S. at 557, 53 S.Ct. at 226.

The concept has since "been elaborated upon and refined in a host of judicial decisions * * * ." *Filtrol Corp. v. United States*, 487 F.2d 536, 538, 203 Ct.Cl. 32, 35

---

**3.** During its fiscal year ended March 31, 1974, plaintiff bore all of the costs incurred in connection with its mining operation, and its only receipts of money were from coal sold to Mr. Talbert.

**4.** Clause (6) of the lease remained in force unchanged.

**5.** For present purposes, defined as "the gross income from mining." Section 613(c)(1).

**6.** Treas.Reg. § 1.611–0 (1970).

(1973). See, e. g., *Paragon Jewel Coal Co. v. Commissioner of Internal Revenue*, 380 U.S. 624, 633, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965); *Parsons v. Smith*, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959); *Commissioner of Internal Revenue v. Southwest Exploration Co.*, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); *Bakertown Coal Co. v. United States*, 485 F.2d 633, 202 Ct.Cl. 842 (1973); *National Steel Corp. v. United States*, 364 F.2d 375, 176 Ct.Cl. 952 (1966). Both the theory underlying the allowance of depletion deductions with respect to the production of minerals, and the principles governing the allowance or denial of such deductions, are settled and familiar, and they need not be repeated herein.[7]

In *Parsons v. Smith, supra,* taxpayers who had entered into agreements with landowners to strip mine coal on land owned by the latter, at the taxpayers' expense, and deliver it to the landowners at a fixed payment per ton, were held not to have a "capital investment in, or * * * any economic interest in, the coal in place * * *," but "a mere economic advantage to be derived from their mining operations." *Id.*

In reaching that result, the Supreme Court stressed that the taxpayers' investments were in their equipment, all of which was movable; that the said investments in equipment were recoverable through depreciation; that the mining contracts were completely terminable without cause on short notice; that the landowners did not agree to surrender and did not actually surrender to the taxpayers any capital interest in the coal in place; that the coal, even after being mined, at all times belonged entirely to the landowners, and that the taxpayers could not sell or keep any of it but were required to deliver all that they mined to the landowners; that the taxpay-

ers were to have no part of the proceeds of the sale of the coal, but, rather, a fixed sum for each ton mined and delivered to the landowners in "full compensation" for their efforts; and that "petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts." *Id.*, 359 U.S. at 225, 79 S.Ct. at 663.

In *Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, supra,* a number of contractors orally agreed with Paragon, a lessee of coal properties, to mine coal at their own expense and to deliver it to the lessee at a fixed fee per ton for mining. The lessee expected to receive the depletion allowance, and fixed its per ton fee for mining with this in mind. The oral agreements were silent respecting termination and were apparently for an indefinite period, but imposed no obligation on the contractors to mine any specific amount of coal. Relying upon *Parsons v. Smith, supra,* the Supreme Court rejected the contention of the contractors that because of their investments of time and money in developing the mines they had an "economic interest in the coal in place." *Id.*, 380 U.S. at 633, 85 S.Ct. at 1211. In so holding, the Court stressed that "the contract miners did not look to the sale of the coal for a return of their investment, but looked solely to Paragon to abide by its covenant." *Id.*, 380 U.S. at 635, 85 S.Ct. at 1213.

These decisions and others, cited by defendant as requiring the conclusion that the February 14, 1973 lease from AMAX to James R. Thornberry, and the March 1, 1973 assignment from Mr. Thornberry to plaintiff, did not convey a depletable economic interest in the coal in place, but gave plaintiff a mere economic advantage, are, on the facts of this record, sharply distinguishable. With respect to depletion, "the

---

7. See *National Steel Corp. v. United States*, 364 F.2d 375, 382–83, 176 Ct.Cl. 952, 965–67 (1966), for a succinct statement of the teaching of the leading cases. It is worthy of note, however, that the depletion allowance "bears little relationship to the capital investment, and the taxpayer is not limited to a recoupment of his original investment. The allowance continues so long as minerals are extracted, and even

though no money was actually invested in the deposit." *Commissioner of Internal Revenue v. Southwest Exploration Co.*, 350 U.S. 308, 312, 76 S.Ct. 395, 398, 100 L.Ed. 347 (1956); see also *Paragon Jewel Coal Co. v. Commissioner of Internal Revenue*, 380 U.S. 624, 639, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965) (dissenting opinion).

tax law deals in economic realities and not in bare legal abstractions \* \* \* or in fictions \* \* \*." *National Steel Corp. v. United States, supra*, 364 F.2d at 383, 176 Ct.Cl. at 967. The facts of this case establish that plaintiff had an economic interest in the coal in place throughout the tax year in suit.

It is, of course, true that whether an instrument creating rights is a lease, sublease, or assignment "has not been deemed significant from the federal tax viewpoint in determining whether or not the taxpayer had an economic interest in \* \* \*" a mineral in place. *Burton-Sutton Oil Co. v. Commissioner of Internal Revenue*, 328 U.S. 25, 32, 66 S.Ct. 861, 866, 90 L.Ed. 1062 (1946). And, whether "a taxpayer has an 'economic interest' in certain property \* \* depends upon the totality of the facts of each case." *Ramey v. Commissioner of Internal Revenue*, 398 F.2d 478 (6th Cir. 1968). In insisting that what is involved here is a mere "contract to mine coal", however, defendant errs.

Pursuant to the March 1, 1973 assignment of the February 14, 1973 lease of coal, plaintiff became obligated diligently to conduct mining operations (to the extent of removal of 800,000 tons of coal from the leased property), to make royalty payments to AMAX at the rate of 75¢ per ton of no. 9 coal mined, removed and sold from the leased property, and to perform all other obligations imposed upon plaintiff's assignor by the terms of the lease. Plaintiff made substantial expenditures in connection with mining and selling the coal (mining engineering expenses, equipment costs, expenses of construction of a haul road and stockpile, the costs of relocating a cemetery entrance road and a county road, and the costs of a strip mining permit and a reclamation bond). It acquired (although not during the fiscal year ended March 31, 1974) surface rights at a cost of $110,000. In all the circumstances, it is crystal clear that plaintiff acquired by investment an interest in the coal in place, within the meaning of Treas.Reg. § 1.611–1(b)(1). *Bakertown Coal Co. v. United States, supra*; see also *Paragon Jewel Coal Co. v.*

*Commissioner of Internal Revenue, supra*; *Winters Coal Co. v. Commissioner of Internal Revenue*, 496 F.2d 995 (5th Cir. 1974); *cf.* Casey, *The Economic Interest—Play it Again Sam*, 24 Tax Lawyer 129 (1970).

Nor, in the facts and circumstances of this case, is there doubt that plaintiff fully satisfies the remaining language of Treas. Reg. § 1.611–1(b)(1), as it defines an "economic interest".

AMAX's primary purpose and intent in leasing its no. 9 coal reserve to plaintiff's assignor was, obviously and understandably, to serve its own best corporate interests. Most, if not all, business decisions are so motivated. Moreover, had plaintiff and Mr. Talbert not reached an agreement which would at least enhance the likelihood of, if not ensure, the achievement of its goals, AMAX might well have decided not to lease the said reserve at all. In and of themselves, however, the foregoing facts are plainly not dispositive of the issue herein.

What distinguishes this case from *Parsons v. Smith, supra*, and *Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, supra* (and from other cases cited by defendant) is that, as a matter of form, of substance, and of economic reality, the lease and assignment conferred upon plaintiff the rights to mine coal and to sell that coal, *at whatever price it could obtain therefor*, to an independent, unrelated, third party (albeit a valued customer of AMAX), and not to AMAX itself.

Put another way, plaintiff was not simply extracting coal for AMAX under a contract with AMAX from which it derived a pecuniary advantage, but was mining coal for sale to a third party, at an independently determined price, and was required to look to the extraction of that coal and the sale thereof for a return on its investment and profit. See, particularly, *Bakertown Coal Co. v. United States, supra*, 485 F.2d at 640, 202 Ct.Cl. at 855–56, where Chief Judge Drennan's dissent in *Charles P. Mullins*, 48 T.C. 571 (1967) is quoted with approval.

A taxpayer who has acquired by investment any interest in mineral in place and who "secures, by any form of legal relationship, income derived from the extraction of the [mineral] * * * to which he must look for a return of his capital" is entitled to a depletion allowance. *Palmer v. Bender, supra.* As a matter of economic reality, plaintiff satisfies the letter and the spirit of the latter requirement. Pursuant to a bona fide, arm's-length legal relationship, it secured income derived from the extraction of coal, and it could and did look solely to the income thus derived for a return of its capital. *Id.; Bakertown Coal Co. v. United States, supra.* Accordingly, defendant's denial of a depletion allowance was erroneous.

Several other facts should briefly be noted, since they tend to confirm the conclusion just stated. First, the record is clear that AMAX had no objection whatever to plaintiff's sale of no. 9 coal to others, provided Mr. Talbert did not need it. Second, AMAX retained no control over plaintiff's management or mining operations; it never saw any mining plans, mining permits, or reclamation plans. Third, in AMAX's view, plaintiff owned the coal it mined. And, AMAX treated the royalty payments it received from plaintiff as capital gains under Section 631(c), thus demonstrating its intent to convey, and belief it had conveyed, an economic interest in the coal in place to plaintiff. *Cf. Parsons v. Smith, supra; Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, supra; Bakertown Coal Co. v. United States, supra,* 485 F.2d at 642, 202 Ct.Cl. at 857.

### III

In its brief, defendant also contends that if plaintiff is entitled to a depletion allowance, plaintiff's computation of the allowance is excessive. Defendant asserts that in computing its taxable income to arrive at the 50 percent limitation stated in Section 613(a), plaintiff erroneously included state income taxes as an addition, rather than a deduction, in its calculations. Plaintiff's reply brief contains no mention of this matter.

Neither party has requested findings of fact on this aspect of the case. Pursuant to Rule 131(c), trial of this matter was limited to the issues of law and fact relating to plaintiff's right to recover. In the circumstances, it is concluded only that plaintiff was erroneously denied a properly computed depletion allowance for its fiscal year ended March 31, 1974, and is entitled to recover taxes and interest assessed in consequence of such erroneous denial, plus interest thereon as provided by law. The amount of plaintiff's recovery should be determined pursuant to Rule 131(c).

MILLER, Judge, dissenting:

I am not persuaded that plaintiff has carried its burden of proving that, during its fiscal year ended March 31, 1974, and for purposes of I.R.C. § 611, it owned an "economic interest" (as distinguished from an "economic advantage") in the No. 9 coal in place under the lease from AMAX to James R. Thornberry, as limited under the March 1, 1973, assignment from James R. Thornberry to plaintiff.

Pursuant to I.R.C. § 611(a), Treasury promulgated Regulation § 1.611–1(b)(1), defining "economic interest" thus:

An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place . . . and secures, by any form of legal relationship, income derived from the extraction of the mineral . . . to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit . . . does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter . . . to compensation for extraction . . . does not convey a depletable economic interest.

As this court said in *Food Machinery and Chemical Corp. v. United States,* 348 F.2d 921, 926, 172 Ct.Cl. 313, 322–23 (1965).

This economic interest . . . test developed by the Court in Palmer [*Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933)] has been the rule used in all subsequent depletion cases . . [and] boils down to two tests for economic interest: (1) A capital investment in the mineral in place, and (2) a return on the investment which is realized solely from the extraction of the mineral. [Footnote omitted.]

The requirement of "a capital investment in the mineral in place" does not demand legal title to the mineral in place.[1] Rather, as developed by judicial decisions, the requirement may be satisfied by the legal fiction of a "constructive investment" in the mineral in place. In *Bakertown Coal Co. v. United States, supra*, 485 F.2d at 638, note 1, 202 Ct.Cl. at 851, this court, discussing G.C.M. 26290, 1950–1 C.B. 42, alluded to—

the constructive equivalent of the fee or leasehold rights of control over extraction and disposition of the underlying mineral historically regarded as the embodiment of the capital investment prerequisite to a depletable interest in the deposit.

See Rev.Rul. 56–542, 1956–2 C.B. 327, 328. Thus, the allowance for a percentage depletion deduction does not necessarily depend on direct investment of money in the mineral deposit. *Commissioner of Internal Revenue v. Southwest Exploration Co.*, 350 U.S. 308, 312, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

However, constructive investment in the mineral in place does not result from the purchase of movable equipment used to extract the mineral (*Parsons v. Smith*, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959), aff'g 255 F.2d 595 (3d Cir. 1958));[2] nor from construction of access roads (*Denise* *Coal Co. v. Commissioner of Internal Revenue*, 271 F.2d 930 (3d Cir. 1959)); nor from removal of overburden to enable the coal to be stripped (see *Parsons v. Smith, supra*, 359 U.S. at 217, 79 S.Ct. 656); nor from construction of a tipple, a power line, a railroad siding, and engineering services (*Paragon Jewel Coal Co. v. Commissioner of Internal Revenue*, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965).

The trial judge found that plaintiff "made substantial expenditures in connection with mining and selling the coal (mining engineering expenses, equipment costs, expenses of construction of a haul road and stockpile area, the costs of relocating a cemetery entrance road and a county road, and the costs of a strip mining permit and a reclamation bond). However, unlike the permanently-installed equipment in *Food Machinery and Chemical Corp., supra*, plaintiff's equipment was movable and could, therefore, later be used for mining operations elsewhere; moreover, plaintiff claimed deductions for depreciation on the equipment—a means of restoring its capital investment. The trial judge found that the engineering expenses, expenses of construction of the haul road and stockpile area, and the costs of relocating the cemetery entrance road were deducted as current business expenses, as were the costs of the mining and reclamation bond; that the cost of relocating the county road was capitalized and "depreciated [sic, amortized?] beginning in plaintiff's fiscal year ended March 31, 1974." At oral hearing, plaintiff's counsel suggested that the cost of removing the overburden constituted the requisite "capital investment in the mineral in place," but admitted that this cost had been deducted as an expense. He also suggested that the royalties paid by plaintiff to

---

1. "The technical title to the oil in place is not important." *Kirby Petroleum Co. v. Commissioner of Internal Revenue*, 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946). As pointed out in *Bakertown Coal Co. v. United States*, 485 F.2d 633, 637, 202 Ct.Cl. 842, 849 (1973), in 1950 Treasury first compromised the requirement of a legal interest in the mineral in place. G.C.M. 26290, 1950–1 C.B. 42.

2. In *Food Machinery & Chemical Corp. v. United States, supra*, the taxpayer had invested $20 million in four permanently-installed electric furnaces and related plant equipment used to reduce the phosphate shale that was mined. The requisite "investment in the mineral in place" was held to be present, because the taxpayer's economic interest was so strong. *C.B.N. Corp. v. United States*, 364 F.2d 393, 398 n. 3, 176 Ct.Cl. 861, 868 n. 3 (1966).

AMAX represented a capital investment, but it is noted that these were payable only *after* the coal was "mined, removed, and sold" to *Talbert, so they could hardly be regarded as an "investment in the mineral in place."*

During the taxable year in question,[3] the salient features of plaintiff's contractual relationship with respect to the No. 9 coal in place were as follows:

(1) It was provided that AMAX "does hereby lease, sublease and let unto Lessee [James R. Thornberry] all of the Kentucky # 9 Vein or Seam of coal" underlying described real estate. The assignment from James R. Thornberry to plaintiff limited plaintiff to extracting 800,000 tons of said coal.

(2) Royalty payments were to be made to AMAX in the amount of 75¢ per ton "for each and every ton of 2,000 pounds of Kentucky # 9 Coal mined, *removed and sold* from the leased premises." (Emphasis supplied.)

(3) The agreement was not terminable by the lessor at will or on short notice,[4] *except* (as expressly provided) in the event of plaintiff's failure "for any reason" to sell all the No. 9 coal to Talbert or in the event of plaintiff's failure to manage its labor force in a manner which would not interfere with AMAX's own mining operation, and except (as implied) in the event of plaintiff's failure to perform according to other terms of the lease from AMAX to James R. Thornberry, including a "Covenant for Diligent Operation."[5]

(4) The term of the lease from AMAX to James R. Thornberry ran from February 14, 1973, through February 28, 1975. The assignment from James R. Thornberry to plaintiff *limited plaintiff's term* to run from March 1, 1973, "until such time as the Assignee [plaintiff] has removed 800,000 tons of coal from the property."[6]

(5) Unlike the assignor, James R. Thornberry, plaintiff did not have the right to mine unlimited quantities of the No. 9 coal.[7] During the taxable year, plaintiff mined some 442,000 tons of coal, all of which it sold to Talbert. Although Hopper, the president of AMAX, testified that plaintiff was free to sell to anyone any coal that was surplus to Talbert's needs, this was not provided for in the lease. Also, it should be noted that the 800,000 tons limit on plaintiff's right to mine coal was equal to Talbert's requirements for a two-year period.

(6) Plaintiff was not free to sell to whomever and at whatever price it

---

**3.** Some changes occurred in the relationship of plaintiff with AMAX and with Talbert following the close of the taxable year, but these cannot be regarded as having had any retroactive effect as far as the taxable year in question is concerned.

**4.** However, terminability was clearly not regarded as controlling by this court in *Bakertown Coal Co. v. United States, supra,* 485 F.2d at 639–40, 202 Ct.Cl. at 853–56, although Judge Nichols in his dissenting opinion thought otherwise. In *Parsons v. Smith, supra,* 359 U.S. at 224, 79 S.Ct. at 662, the Court, in holding that strip mining contractors did not own an economic interest, emphasized that the contracts "were completely terminable without cause on short notice."

**5.** This provided as follows:
Lessee, with all reasonable dispatch and as soon as practicable hereafter, shall enter upon the said leased premises and begin and continue mining operations thereon, it being the purpose and spirit of this Lease to secure the prompt development and continuous operation of mining and removing said coal and to secure as full, complete and speedy operation thereof as can be done practicably and economically by Lessee.

**6.** Plaintiff's term under the assignment actually expired October 10, 1974, by which date plaintiff had mined 800,000 tons of No. 9 coal. Thereupon the lease was reassigned to James M. Thornberry (sole). The trial judge found that in November 1974 plaintiff purchased surface rights in certain reserves of No. 9 coal, but this finding has no relevance to the taxable year in question.

**7.** The right to mine unlimited quantities of coal from designated areas on which royalties were to be paid to the lessor was one of the three "relevant features" of the agreements underscored by this court in *Bakertown Coal Co. v. United States, supra,* 485 F.2d at 634, 202 Ct.Cl. at 844.

chose,[8] but had to rely on what was essentially a fixed price contract (with a production cost escalation provision) negotiated with Talbert.[9] A mutually acceptable contract between Talbert and the Thornberrys to meet Talbert's needs for 400,000 tons of No. 9 coal per year for two years was a condition precedent to AMAX's executing the lease to James R. Thornberry.

(7) Because of the Covenant for Diligent Operation, plaintiff was not free to produce as it chose. See *Helvering v. Bankline Oil Co.*, 303 U.S. 362, 368, 58 S.Ct. 616, 82 L.Ed. 897 (1938).

The trial judge has clearly erred, as a matter of law, in interpreting the lease and assignment to have "conferred upon plaintiff the rights to mine coal and to sell that coal, *at whatever price it could obtain therefor*, to an independent, unrelated third party (albeit a valued customer of AMAX), and not to AMAX itself." It is true that the lease from AMAX to James R. Thornberry, par. (6), required that all Kentucky No. 9 coal be sold to Talbert, and this obligation was transferred to plaintiff by the assignment from James R. Thornberry. However, the contract covering the sale of coal by plaintiff to Talbert at the price they had negotiated was entered into *before*, and *as a condition precedent to*,[10] AMAX's exe-

cution of the lease to James R. Thornberry. What was, in substance, a fixed price contract (subject to adjustments for plaintiff's increased costs, but not for market fluctuations) was locked up *first*, and the *subsequent* lease from AMAX and assignment from James R. Thornberry did *not* confer upon plaintiff any right to change either the price or the purchaser under that contract. As a matter of economic reality, the fact that the lease and assignment obligated plaintiff to sell the coal to AMAX's designee (Talbert), rather than to AMAX itself, is without significance. In either event, plaintiff was *not* free to sell "to whomever and at whatever prices" it chose, as was the situation in *Bakertown Coal Co. v. United States, supra.*

The trial judge has found that Hopper testified as "a credible and persuasive witness" that "plaintiff owned the coal it mined and was free to sell any of that coal surplus to Mr. Talbert's needs to anyone." However, any freedom to sell coal surplus to Talbert's needs which, as pointed out earlier, was not provided for in the lease, was purely cosmetic, since Talbert would have been expected to purchase all of the coal mined by plaintiff during the taxable year in question. Further, it should be emphasized that ownership of "the coal it

---

8. The right of lessees "to extract and dispose of the coal underlying the leased premises to whomever and at whatever prices they chose" was clearly a decisive factor in *Bakertown Coal Co. v. United States, supra,* 485 F.2d at 642, 202 Ct.Cl. at 857–58. See the dissenting opinion of then Chief Judge Drennan in *Charles P. Mullins,* 48 T.C. 571, 583 (1967), on which this court relied in *Bakertown.*

9. During the taxable year in question, there was no agreement between plaintiff and Talbert for any increases in the price of coal sold to Talbert to reflect market fluctuations. Talbert paid $5.90 per ton from April 1 to May 15, 1973. To reflect plaintiff's cost increases Talbert paid $5.95 per ton from May 16 to August 15, 1973; $6.00 per ton from August 16 to November 15, 1973; and $6.27 per ton from November 16, 1973, to March 31, 1974.

10. According to the trial judge's finding No. 18, "Mr. Hopper [AMAX's president] also told Mr. Thornberry that if he could 'work out something' with Mr. Talbert, AMAX would lease the

no. 9 coal to Mr. Thornberry." According to the trial judge's finding No. 19(c), "Prior to February 14, 1973 [date of the lease from AMAX to James R. Thornberry] . . . Mr. [James M.] Thornberry and Mr. Talbert then entered into an oral agreement for the sale by plaintiff to Mr. Talbert of approximately 400,-000 tons of no. 9 coal per year for two years, at a base price of $5.75 per ton. That oral agreement included a 'cost escalation' provision pursuant to which Mr. Talbert agreed to compensate plaintiff for any documented increased production costs, with such cost increases to be determined on a semi-annual basis. Neither Mr. Thornberry nor Mr. Talbert discussed possible downward cost escalation, nor were possible price increases due to changes in market conditions either anticipated or discussed. The Thornberrys thereafter advised Mr. Hopper that they had reached an agreement with Mr. Talbert, and that they would like to lease AMAX's no. 9 coal reserve." [Footnote omitted.]

mined" (not to exceed 800,000 tons under the assignment to plaintiff) would not have been ownership of the coal *in place.* Whether lease of the vein or seam of coal to James R. Thornberry conveyed ownership of the coal in place is not before us.

The trial judge has also found that for federal income tax purposes, AMAX treated the royalties received from plaintiff as long-term capital gain, and he has concluded that this demonstrated "its intent to, and belief it had, conveyed [sic] an economic interest in the coal in place to plaintiff." However, AMAX's unilateral intent and belief are clearly not controlling; what the parties did is controlling.

Finally, the trial judge clearly erred in concluding, as a matter of law, that, for purposes of Treas.Regs. § 1.611–1(b)(1), plaintiff "could and did look solely to the income thus derived [from the extraction of coal] for a return of its capital." If, in fact, plaintiff had been free to sell the mined coal at a price reflecting the market, as was the situation in *Bakertown Coal Co. v. United States, supra,* such a conclusion might well be correct. However, in applying the language just quoted, which was taken largely from Treasury Regulation § 1.611–1(b)(1), the Supreme Court in *Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, supra,* 380 U.S. at 635, 85 S.Ct. at 1213, stated:

> As we said in *Palmer v. Bender,* 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 489 (1933), the deduction [for depletion] is allowed only to one who "has acquired, by invest-

ment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, *to which he must look for a return of his capital.*" (Emphasis supplied.) Here, Paragon was bound to pay the posted fee regardless of the condition of the market at the time of the particular delivery and thus the contract miners did not look to the sale of the coal for a return of their investment, but looked solely to Paragon to abide by its covenant.

So too, here, regardless of the condition of the market, Talbert was bound to pay plaintiff the agreed-upon price, so that plaintiff did not look to the sale of the coal, but solely to Talbert to abide by his agreement. See *Parsons v. Smith, supra,* 359 U.S. at 225, 79 S.Ct. 656, citing *Helvering v. O'Donnell,* 303 U.S. 370, 372, 58 S.Ct. 619, 82 L.Ed. 903 (1938);[11] *Usibelli v. Commissioner of Internal Revenue,* 229 F.2d 539, 543–44 (9th Cir. 1955).

Under either test set forth in *Food Machinery and Chemical Corp. v. United States, supra,* plaintiff has failed to show that it owned an economic interest in the No. 9 coal in place.[12]

Accordingly, plaintiff's petition should be dismissed.

## CONCLUSION OF LAW

Upon the trial judge's findings and foregoing opinion, which are adopted by the court, the court concludes as a matter of

---

11. The Third Circuit in *Parsons v. Smith, supra,* at 597, after noting that there was a set price, not geared to the market, said: "And since that price did not fluctuate with the market, there is nothing about the scheme of payment to indicate any interest of the contractor in the mineral."

12. During the taxable year in question, plaintiff operated essentially as a contract coal miner, obligated to diligently mine and sell coal to Talbert at a fixed price and to pay royalties to AMAX. In its opinion in *Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, supra,* 380 U.S. at 637, 85 S.Ct. at 1214, the Court provided a further basis for holding that plaintiff here was not the "owner" of an economic interest in the No. 9 coal in place:

> In contrast to the language in § 631(c), it is noted that in treating with timber in § 631(b) an "owner" is allowed capital gains instead of depletion. In this instance "owner" is defined to be "any person who owns *an interest in such timber,* including a sublessor and *a holder of a contract to cut timber.*" (Emphasis supplied.) This last phrase as to contractors is not included in § 631(c) thus indicating that as to coal, "owner" does not include contract coal miners. Clearly the Congress knew what language to use when it wished to give a contractor a tax allowance. It gave holders of contracts to cut timber capital gains treatment in § 631(b) but did not so provide for contract coal miners in § 631(c).

law that plaintiff is entitled to recover and judgment is entered to that effect. Absent a stipulation of the parties as to the amount of recovery due plaintiff, that amount is to be determined in further proceedings pursuant to Rule 131(c).